Ernest DAGUE, Sr., Ernest Dague, Jr.,
Betty Dague, and Rose A. Bessette,
Plaintiffs–Appellees,

v.

CITY OF BURLINGTON,
Defendant–Appellant.

No. 415, Docket 90–7544.

United States Court of Appeals,
Second Circuit.

Argued Oct. 29, 1990.

Decided June 12, 1991.

William W. Pearson, Burlington, Vt. (Downs Rachlin & Martin, Richard N. Bland, of counsel), for plaintiffs-appellees.

Michael B. Clapp, Burlington, Vt. (Dinse, Erdmann & Clapp, Robert R. McKearin, of counsel), for defendant-appellant.

Before NEWMAN and PRATT, Circuit Judges, GRIESA, District Judge for the Southern District of New York, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

Plaintiffs are owners of land adjacent to the Burlington Municipal Disposal Grounds (the "landfill"). They brought this action against the City of Burlington for alleged violations of state and federal laws arising out of the operation of the landfill. Plaintiffs alleged that the operation of the landfill generally harmed the environment, and specifically damaged their properties, by generating methane gas, wind-blown debris, and hazardous waste. The city closed the landfill on December 31, 1989.

The plaintiffs' ten-count complaint sought injunctive relief, civil penalties, compensatory damages, and punitive damages, plus costs and attorneys' fees. Judge Billings held a bench trial on the first five counts of the complaint. Counts I, II, and III were brought pursuant to the citizen-suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972; count IV was brought pursuant to the citizen-suit provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1365; and count V was brought pursuant to the Vermont Groundwater Protection Law, 10 Vt.Stat.Ann. § 1410.

The district court found that the City of Burlington had operated the landfill in violation of prohibitions against open dumping practices found in 42 U.S.C. § 6945(a); that the landfill may have presented an imminent and substantial endangerment to

health or the environment in violation of 42 U.S.C. § 6972(a)(1)(B); and that the landfill had discharged pollutants from a point source into waters of the United States in violation of 33 U.S.C. § 1311. Liability under the remaining common law claims, counts VI through X, and the issue of damages on count V, were reserved for trial by jury at a later date.

The district court denied a motion by the city to dismiss counts II, III, and part of IV of the complaint, made on the ground that plaintiffs had failed to comply with the notice and delay requirements for citizen-suits under 42 U.S.C. § 6972(a) and 33 U.S.C. § 1365(a).

In addition, the court found that the plaintiffs had substantially prevailed and awarded them total attorney's fees, pursuant to 42 U.S.C. § 6972(e) and 33 U.S.C. § 1365(d), in the amount of $247,534.37, which included a "lodestar" amount of $198,027.50 plus a 25 percent risk/contingency enhancement of $49,506.87. The court also awarded plaintiffs $10,929.66 in expenses, including expert fees.

The city appeals all of these rulings.

## BACKGROUND

The City of Burlington has owned and operated the landfill since the early 1960s. The landfill is rectangular in shape and is located on approximately eleven acres of land to the north of the commercial-residential center of the city. It is bounded to the east and south by properties owned by the plaintiffs, to the north by a railroad embankment, and to the west and northwest by a marsh area called the Intervale, which has been designated a wetland, as well as by Beaver Pond, which is actually the southeast portion of the marsh. A large stone culvert runs under the railroad and connects the Beaver Pond portion of the marsh with the northeast quadrant of the Intervale.

The Intervale is in the flood plain of the Winooski River. It is inundated or saturated by surface water sufficient to support a variety of vegetation typically adapted for life in saturated soil conditions. The Intervale occasionally floods, leaving the entire area covered with surface water, including parts of the landfill itself. At normal times, water in the culvert is either in equilibrium or flows from south to north through the culvert. During times of high water, however, surface water may flow from north to south through the culvert.

Trash is buried in the landfill to a depth of approximately nine feet below the ground water table on the northern edge of the landfill. Historically, rain water and run-off from the land have been able to percolate into the landfill mass. As a result, groundwater mixes with and flows through contaminants in the landfill.

The landfill contains typical domestic and municipal wastes as well as materials deposited over the years by local industries. When groundwater infiltrates the landfill, the water mixes with the material in the landfill and forms leachate. Leachate is a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such wastes. The leachate is generated both by percolation of precipitation into the landfill mass and by the flow of groundwater through the refuse in the landfill. The leachate produced in the landfill contains chemicals and compounds found on toxic and hazardous lists under RCRA and the CWA. Because the landfill is unlined, the leachate enters the upper gradients or "flow tubes" of ground water under the landfill. The ground water then flows north beyond the landfill boundaries, and the flow tubes of the leachate-contaminated groundwater all surface in the Intervale, north of and within 300 feet of the railroad embankment.

Leachate has also emerged from the sides of the landfill via seeps. From there, it flows into Beaver Pond and thence through the culvert under the railroad embankment and into the Intervale. The fact that leachate from the landfill is toxic to a small fish called the fathead minnow demonstrates that the leachate can kill a vertebrate in the food chain. The leachate also kills Daphnia (water fleas) and algae.

In the early 1980s, the State of Vermont began to closely scrutinize the landfill. As a result of the state's investigation, the state and the city entered into an Assurance of Discontinuance on December 15, 1981, which nominally required the city by July 1, 1984, to cease disposing of any refuse in the landfill, with the exception of residue from a planned resource recovery facility. When the city did not comply, the terms of the Assurance were amended several times, the most pertinent amendment ("Amended Assurance") occurring on January 31, 1985. It required that the city install and make operational a leachate collection system at the landfill by September 1, 1985, and that the city install and make operational a methane gas control system by December 1, 1985. It also gave the city two options: (1) select another landfill site and close the current landfill by January 1, 1988, or (2) begin operating a resource recovery facility ("RRF") and close the landfill by January 1, 1990. This Amended Assurance was entered as an order of the Chittenden Superior Court on March 7, 1985.

The city did not timely comply, however, even with the terms of the Amended Assurance. It did not install the leachate collection system or the methane gas control system until March of 1986, after the State of Vermont, on December 18, 1985, had brought an action against the city to enforce the March 7th order. Moreover, the city never notified the state in writing of its choice between the two closure options, despite its obligation to do so. While the city's board of aldermen did adopt a resolution to pursue the RRF option, the mayor vetoed the resolution.

During the years 1985 and 1986, the state performed its own environmental assessment of the landfill, conducting substantial monitoring and testing of the area in and around the landfill, and collecting both leachate data and biological data. While the state concluded, as a result of its investigation, that the landfill did not, at that time, present an imminent and substantial endangerment to human health or the environment, it did determine that January 1, 1990, was the appropriate closure date in view of the environmental concerns presented by the landfill.

Plaintiffs filed their complaint in this matter on October 9, 1985. The day before, plaintiffs had mailed letters to the defendant city, the State of Vermont, and the Administrator of the Environmental Protection Agency (the "EPA"), notifying them of plaintiffs' contention that the city was operating the landfill in violation of sections 6925, 6930, and 6945 of RCRA, and sections 1311, 1317, and 1342 of the CWA. Plaintiffs moved for a preliminary injunction seeking immediate closing of the landfill. The case was initially referred to the Honorable Jerome J. Niedermeier, United States Magistrate for the District of Vermont, to hear and determine the motion. The city moved to dismiss the complaint primarily on the basis of failure to comply with the notice prerequisites of 42 U.S.C. § 6972(a) and 33 U.S.C. § 1365(a). The court suggested that the plaintiffs then file a proper notice under RCRA and CWA and reserved decision on the motion to dismiss. Heeding the court's suggestion, the plaintiffs filed a "supplemental" notice.

In February of 1986, the magistrate issued a Report and Recommendation, finding for purposes of the preliminary injunction motion, that the city was in violation of § 6945(a) of RCRA and § 1311(a) of the CWA. However, the magistrate recommended that the court deny plaintiffs' motion at that time and order the city to take certain specific steps toward remedying the violations. Adopting the magistrate's Report and Recommendation *in toto*, the district court denied plaintiffs' motion for a preliminary injunction and ordered the city, within sixty days, to make fully operational both a gas ventilation system and a leachate collection system for the landfill. At this point, the city complied.

After a bench trial, the district court issued its Findings of Fact, Opinion and Order. 732 F.Supp. 458. As to count I, it concluded that the city had not violated the hazardous waste permit and notification requirements of 42 U.S.C. §§ 6925(a) and 6930(a). It based this holding on the fact that the State of Vermont had authoriza-

tion to implement its own solid and hazardous waste program pursuant to 42 U.S.C. § 6926(b), and that the state's regulations superseded the requirements under RCRA. Accordingly, the court found that a direct action to enforce the RCRA regulations was not available to the plaintiffs. *See Williamsburgh–Around–the–Bridge Block Assn., et al. v. Jorling, et al.,* No. 89–CV–471, slip op. at 10, 1989 WL 98631 (N.D.N.Y. August 21, 1989); *Thompson v. Thomas,* 680 F.Supp. 1, 3 (D.D.C.1987).

As to count II, which alleged three separate open dumping practices in violation of 42 U.S.C. § 6945(a), the court found that (a) the city had generated methane gas, in violation of 40 C.F.R. § 257.3–8(a)(2), but had abated that practice on or about December 27, 1985, and since then had not violated this provision; (b) the city had, through a point source, discharged pollutants into waters of the United States without a permit, in violation of 40 C.F.R. § 257.3–3(a); and (c) the city had not contaminated an underground drinking water source beyond the landfill boundary, and therefore had not violated 40 C.F.R. § 257.3–4(a).

As to count III, the court held that the city had violated subchapter III (hazardous waste management provisions) and subchapter IV (solid waste management provisions) of RCRA because the landfill may have presented an imminent and substantial endangerment to health or the environment, and therefore, its continued operation violated 42 U.S.C. § 6972(a)(1)(B).

As to count IV, the court found that the city had violated the CWA by discharging pollutants from a point source (the railroad culvert) into the Intervale without authorization. Finally, as to count V, the court held that the city had violated Vermont's Groundwater Protection Law, 10 Vt.Stat. Ann. § 1410, by altering the character and quality of the groundwater beneath and north of the landfill.

Subsequently, the district court entered an Opinion and Order denying the city's motion to dismiss counts II, III, and part of IV, and it also entered an Opinion and Order granting the plaintiffs' motion for attorney's fees. The district court then entered judgment with respect to its holdings on counts I through IV, and pursuant to Fed.R.Civ.P. 54(b), certified for appeal the judgment on the federal issues presented by these four counts. The court deferred for future action the damage issues under state law that were presented by count V.

## DISCUSSION

The city raises four issues on this appeal. We turn first to the threshold issue of notice and consider (A) whether the district court erred in determining that *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989), did not require dismissal of the case. If *Hallstrom* governs, and plaintiffs' mailing of the notice of suit one day before commencing this action was inadequate, we could dismiss the case on that ground alone. However, since we conclude that the district court was correct in finding that the delay requirement was inapplicable in the circumstances of this case, we must also consider the remaining issues raised by the city: (B) that the district court erred in determining that the culvert was a "point source" for purposes of finding a CWA violation; (C) that the district court incorrectly found that the landfill may present an imminent and substantial harm to health and the environment; (D) that the district court erroneously awarded attorney's fees. We shall discuss these issues separately.

### A. Pre–Suit Notice

Initially, we must determine whether this action must be dismissed because the plaintiffs failed to comply with the notice and delay requirements under the citizen-suit provisions of RCRA and the CWA. *See* 42 U.S.C. § 6972 and 33 U.S.C. § 1365. Section 6972(a) sets forth the specific circumstances under which a citizen may commence a citizen suit, and § 6972(b) provides limitations on this ability to file suit. One type of limitation is the requirement for notice to the defendants and a time period of delay before commencing suit. This case involves three such notice provisions:

(1) Section 6972(b)(1) of RCRA, which applies to actions brought pursuant to subsection A of § 6972(a)(1), states in relevant part:

(1) No action may be commenced under subsection (a)(1)(A) of this section—

(A) prior to 60 days after the plaintiff has given notice of the violation to—

(i) the Administrator;

(ii) the state in which the alleged violation occurs; and

(iii) to any alleged violator of such permit, standard, regulation, condition, requirement, prohibition, or order,

*except* that such *action may be brought immediately after such notification* in the case of an *action* under this section *respecting a violation of subchapter III* of this chapter; or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order.

\* \* \* \* \* \*

42 U.S.C. § 6972(b)(1) (emphasis added).

(2) Section 6972(b)(2), which applies to actions brought pursuant to subsection B of § 6972(a)(1), provides for a 90–day delay period, but is similar to § 6972(b)(1) in all other respects. (3) Section 1365(b) of the CWA, which applies to actions brought pursuant to § 1365(a), requires a 60–day delay period after giving notice to the same relevant parties, but it does not apply if the action alleges a violation of § 1316 or § 1317(a).

To comply with these requirements, plaintiffs' attorney mailed, by first-class mail, letters notifying the defendant city, the State of Vermont, and the Administrator of the EPA of plaintiffs' contention that the city was operating the landfill in violation of 42 U.S.C. §§ 6925, 6930, and 6945, and 33 U.S.C. §§ 1311, 1317, and 1342. Plaintiffs, however, did not wait out the delay periods. In fact, the very next day, they filed their complaint with the district court. After the court found that the letter did not meet all the substantive requirements for notice under RCRA and the CWA and ordered the plaintiffs to file a proper notice, plaintiffs then mailed a "supplemental" notice, whose content satisfied the statutory requirements, but whose timing provides one of the major issues on this appeal.

The city relies on the Supreme Court's recent decision in *Hallstrom v. Tillamook County*, 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989), in urging that the plaintiffs' action must be dismissed because their failure to adhere to the statutory notice and delay provisions both prohibits the commencement of the action and, at the same time, deprives the district court of subject matter jurisdiction to entertain the action. In *Hallstrom*, the Court stated that § 6972(b)'s notice and delay requirements are "mandatory conditions precedent to commencing suit under the RCRA citizen-suit provision; a District Court may not disregard these requirements at its discretion." Pointing to the clear statutory language and plaintiffs' failure to give any notice either to the Administrator or to the state where the violation occurred until after the suit commenced, the Supreme Court dismissed the complaint despite the fact that the case had gone to trial and the plaintiffs had won on the merits. *Hallstrom*, 110 S.Ct. at 311. The city here argues that the Court's refusal in *Hallstrom* to depart from the literal meaning of the notice requirements compels dismissal of the plaintiffs' complaint as "barred by the terms of the statute."

The district court rejected this argument. 733 F.Supp. 23. It held that *Hallstrom* did not control because that case did not address a situation where the plaintiffs allege a claim "respecting a violation of subchapter III", which deals with hazardous waste pollution. The court concluded that *Hallstrom* was applicable only to situations where no hazardous waste violations were alleged, and since the instant complaint raised two claims arising under subchapter III, dismissal pursuant to *Hallstrom* was not necessary.

■ We agree with the district court, at least to an extent sufficient to uphold the court's jurisdiction. The 1984 amendments to RCRA and the CWA, 42 U.S.C. § 6972(b) and 33 U.S.C. § 1365(b), respectively, made clear that at least plaintiffs' hazardous waste claims in count I (subchapter III violations) could be brought immediately after giving notice to the administrator of the EPA, the state and the alleged violator. The remaining question, therefore, is whether the notice and delay requirements apply when allegations of subchapter III violations are combined with non-subchapter III claims in a single "hybrid" complaint. Neither congress nor the Supreme Court in *Hallstrom* addressed the problems associated with this type of "hybrid" situation.

The city argues that the Supreme Court's holding and strong language in *Hallstrom* mandate dismissal of this "hybrid" complaint. It also argues that if plaintiffs could circumvent the delay requirements by simply asserting a subchapter III claim, whether or not such a claim has merit, the congressional policy for delay would be effectively nullified.

The delay periods in the citizen-suit provisions result from a congressional compromise "between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits." *Hallstrom*, 110 S.Ct. at 310. Compliance with the notice and delay provisions fulfills this congressional goal in two ways. First, governmental agencies can take the lead in enforcing environmental regulations, with the hope that "an agency may be able to compel compliance through administrative action, thus eliminating the need for any access to the courts." *Id.* Second, the alleged violator is given a nonadversarial period in which he has the opportunity to comply with the law, thus obviating the need for the citizen suit. *Id.*

In the 1984 amendments to RCRA, however, congress abrogated the delay periods when an "action" under § 6972 "respect[s]" a violation of the hazardous waste management provisions (subchapter III) of RCRA. 42 U.S.C. §§ 6972(b)(1)(A) and 6972(b)(1)(B). When violations of the EPA's permit requirements for hazardous wastes are involved, congress felt it necessary to carve out exceptions to the delay requirements so that citizen suits could be brought immediately. *Hallstrom*, 110 S.Ct. at 309. Congress obviously determined that with hazardous wastes the dangers of delay and the potential for greater damage to public health or the environment outweigh the justifications for the pre-suit delay periods. It struck the balance in favor of prompt citizen enforcement of hazardous waste violations over its other policy aims of encouraging nonjudicial and nonadversarial resolution of environmental conflicts.

The district court found that under the city's interpretation, a citizen would have to choose between (1) delaying 60 days before bringing the hazardous waste claim so that all the claims could be brought simultaneously, or (2) filing the hazardous waste claim immediately after notice is given and then seeking leave to amend the complaint to add the remaining claims after 60 days has passed. It felt that plaintiffs with subchapter III claims should not have to make this choice. Thus, the court held that when plaintiffs have a "hybrid" complaint, the delay periods otherwise required before commencing a non-subchapter III suit become inapplicable.

The district court reasoned that the policy reasons for requiring a delay period, as identified in *Hallstrom*, were no longer important once a hazardous waste violation was alleged. First, when hazardous waste violations are involved, the interest of promoting initial governmental enforcement action is substantially diminished, as is the preference for administrative resolution: "[T]here is no need to maintain a window of opportunity for the government to take the lead enforcement role as to non-subchapter III claims when a citizen, acting as a private attorney general, has already lawfully assumed the lead role in bringing a subchapter III claim against the same facility." 733 F.Supp. at 26. Second, when a citizen suit is filed to enforce hazardous waste violations, the citizen and the alleged

violator are automatically placed in an adversarial posture; therefore, the district court concluded, the filing of a citizen suit involving subchapter III claims, immediately after giving notice, effectively eliminates the opportunity for the alleged violator to achieve compliance with the non-subchapter III claims in a non-adversarial climate.

We agree with the analysis of the district court. Although the Supreme Court's language in *Hallstrom* leans toward a strict application of the notice and delay requirement, rigid adherence in this case, which involves hazardous wastes, would lean too far, for it would circumvent congress's intent in enacting these statutes. *Hallstrom* is therefore distinguishable, because there the plaintiffs had plainly disregarded the language of the statute by filing a complaint alleging only non-subchapter III violations without mailing any notice whatsoever. Here, plaintiffs did give notice to the appropriate parties identified in the statute, and then filed their "hybrid" complaint the next day, alleging violations of both subchapter III and non-subchapter III provisions.

Although the city's argument—that plaintiffs can easily circumvent the delay requirements by simply alleging a subchapter III violation, whether or not it is meritorious—does raise some concern, we do not think it outweighs congress's manifest intent to encourage quick citizen enforcement of hazardous waste violations of subchapter III. Of course, if a plaintiff should allege frivolous subchapter III claims, he would not only be subject to rule 11 sanctions, but his claims could also be dismissed early in the litigation process, and the court, by stay or dismissal, could require full observance of the delay period. Moreover, in order to eliminate the delay requirement with a "hybrid" complaint, the two types of violations would have to be closely related. In this case, for example, plaintiffs' subchapter III and non-subchapter III claims all arose from the operation of a single facility and are based on the same core of interrelated facts.

In addition to its general argument that counts II and IV must be dismissed because they were filed prematurely, the city also makes more particular arguments as to why it believes that all the counts should be dismissed.

### 1. EPA–Authorized State Hazardous Waste Program

■ The city claims that RCRA's exception to the delay requirements for subchapter III actions is not applicable in Vermont because that subchapter has been superseded by Vermont's approved Hazardous Waste Management Plan pursuant to 42 U.S.C. § 6926(b). We disagree. We note initially that plaintiffs' complaint contains two counts that allege hazardous waste violations—counts I and III. Count I was brought pursuant to subsection A of the citizen suit provision, 42 U.S.C. § 6972(a)(1), and count III was brought pursuant to subsection B.

Within the general citizen suit provision of RCRA (§ 6972(a)(1)), two separate subsections specify two different types of actions that may be brought. Subsection A primarily addresses violations of permits, standards, regulations, and the like. Subsection B allows causes of action against those whose activities "ha[ve] contributed or * * * [are] contributing to the past or present handling, storage, treatment, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment".

Pursuant to § 6926(b), an EPA-authorized state hazardous waste program, like that in Vermont, can supersede the permit and notification requirements of subchapter III of RCRA. However, a state's own hazardous waste program affects only those actions brought pursuant to subsection A, *i.e.*, those that depend upon the specific permit and notification requirements in subchapter III. Subsection B, on the other hand, is more general, and allows a direct cause of action against those whose activities "may present an imminent and substantial endangerment to health or the environment". Thus, a subsection B suit does not depend on any specific sub-

chapter III provision, nor is it superseded by a state program.

In this case, the district court did find that the federal permit and notification requirements of subchapter III of RCRA were superseded by the EPA-authorized state hazardous waste program, and thus, that a direct action pursuant to subsection A of the citizen suit provision to enforce § 6925(a) and § 6930(a), as alleged in count I of plaintiffs' complaint was not available. *See Williamsburgh–Around–the–Bridge Block Assn., et al. v. Jorling, et al.*, No. 89–CV–471, slip op. at 10, 1989 WL 98631 (N.D.N.Y. August 21, 1989); *Thompson v. Thomas*, 680 F.Supp. 1, 3 (D.D.C.1987). However, the district court also found that count III, brought pursuant to subsection B, alleged a claim "respecting a violation of subchapter III" sufficient to trigger RCRA's exception to the delay period. We are not as confident as the district court that count III was a claim "respecting a violation of subchapter III," although the defendant apparently conceded that it was. *See* 733 F.Supp. at 27. But count I does not cease to be sufficient to keep the "hybrid" complaint in court simply because count I ultimately proved to be unsuccessful. *Hallstrom* makes clear that the notice determination is to be made at the outset, and in this case count I survived defendant's motion for summary judgment. For this reason, the exception to the delay requirement for this "hybrid" complaint applies.

2. Commencement and Prosecution of an Action by the State

■ The city next argues that count II is prohibited by the provisions of subsection B of § 6972(*b*)(1) (not to be confused with § 6972(*a*)(1) discussed above), because the state had already obtained an order from a state court requiring compliance with the standards alleged to have been violated. In this connection, the state had entered into an Assurance of Discontinuance with the city, which agreement was filed and entered as an order of the state court. Subsection B of § 6972(*b*) does provide that if "the Administrator or State *has commenced and is diligently prosecuting*

*a civil or criminal action * * * to require compliance*" (emphasis added), a citizen's enforcement action cannot be commenced.

We do not think that what the state did in this situation falls within this provision. The Assurance in this case was an agreement between the state and the city that was simply filed and entered as an order of the state court. No "civil or criminal action" was ever commenced against the city to require compliance with federal regulations. Even if the Assurance were to be viewed as an action to compel compliance with federal regulations, the state could not be held to have "diligently prosecut[ed]" the action. The only thing the state ever did to try to enforce the Assurance was to bring an action to compel compliance with provisions of the Assurance that required the city to install a methane gas control system and a leachate collection system. This action was not taken until the deadline for installation had already passed. The plaintiffs had already filed this action and the district court had ordered the city to install operational systems before the city complied. Beyond this one action, the state made no attempt to ensure compliance with the rest of the Assurance; instead it allowed the city numerous extensions. Given these facts, the state's conduct in this case does not meet the level of diligence that would trigger the prohibition against a citizen suit. *See Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57 (2d Cir.1985).

3. CWA Exception to Delay Requirement

■ The city also claims that although an exception to the 60–day delay requirement exists under § 1365 of the CWA for actions respecting either § 1316 or § 1317(a) of the act, neither exception is applicable in this case. The city is correct because no § 1316 violation was alleged and because § 1317 imposes obligations only on the EPA administrator, not the defendant city. But the point is irrelevant. Because, as we discussed earlier in this opinion, the CWA claim was brought as part of a "hybrid" complaint, which simul-

taneously alleged hazardous waste violations under RCRA, there was no need to observe the 60–day delay requirement of § 1365.

### 4. Content Requirements of Notice Provisions

■ Finally, the city argues that the plaintiffs' notice did not comply with the content requirements of the statutory and regulatory notice provisions, thus mandating dismissal under *Hallstrom*. In the first place, *Hallstrom* did not address such technical criteria. Moreover, the drastic measure of dismissal should not be used at this stage of the litigation.

■ As a practical matter, notice in a subchapter III case accomplishes little other than notifying the appropriate governmental agencies and the alleged violator that the filing of a complaint by citizens is imminent. In contrast, in a non-subchapter III case, specific notice gives the appropriate governmental agencies an opportunity to act and the alleged violator an opportunity to comply. Because prior notice in suits involving hazardous wastes is of minimal value, dismissal should not follow in this case merely because plaintiffs failed to comply with some very technical aspects of the notice provisions. To hold otherwise not only would allow form to prevail over substance, but also would thwart congress's purpose of providing an exception to the strict notice requirements in instances involving the heightened danger and immediacy of hazardous wastes. *See Hallstrom*, 110 S.Ct. at 309. Thus, the supplemental notice served in response to the district court's suggestion was sufficient.

### B. *Point Source*

■ We next consider the issue of whether the district court erred by concluding that the railroad culvert was a point source for the discharge of pollutants and therefore that the city was violating 33 U.S.C. § 1311(a). Pollutants from the landfill directly enter Beaver Pond before flowing through the culvert into the rest of the Intervale. Both Beaver Pond and the rest of the Intervale are parts of the marsh, and both are considered navigable waters for purposes of the CWA. Thus, any pollutants in water flowing through the culvert have already entered waters of the United States before they flow through the culvert.

Section 1311(a) provides:

"Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342 and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).

Section 1362(12) defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source". Section 1362(14) defines a "point source" as

"any discernible, confined and discrete conveyance including, but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

The city contends that the railroad culvert was not a point source for the discharge of pollutants. According to the city, the definition of a point source incorporates both physical and functional characteristics. Although it acknowledges that the culvert has many of the physical characteristics of a point source, it alleges that the culvert does not meet the functional requirements, because the culvert does not "add" pollutants to navigable waters. Under this argument, pollutants would be "added" only when they are introduced into navigable waters for the first time.

■ The definition of a point source is to be broadly interpreted:

The touchstone of the regulatory scheme is that those needing to use the waters for waste distribution must seek and obtain a permit to discharge that waste, with the quantity and quality of the discharge regulated. The concept of a point source was designed to further this scheme by embracing the broadest possible definition of any identifiable convey-

ance from which pollutants might enter waters of the United States. *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir.1979). In *United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361 (D.N.H.1985), the court held that waste materials which collected in a ditch and from there entered a brook and ultimately entered navigable waters violated § 1311(a). In *United States v. Velsicol Chemical Corp.*, 438 F.Supp. 945, 947 (W.D.Tenn.1976), the court found discharges into the city sewer system, which, in turn, emptied into the Mississippi River to be in violation of the CWA. It rejected the argument that the pollutants must be discharged directly into navigable waters. *Id.* The fact that the defendant discharged pollutants through conveyances owned by another party was irrelevant. The court found that the defendant knew or should have known that the city sewers led directly into the Mississippi River and this was sufficient to satisfy the CWA requirements. *Id.*

Given the intended broad reach of § 1311(a), we agree with the district court that the Burlington culvert was a point source. We also note that the definition of "discharge of a pollutant" refers to "any point source" without limitation. 33 U.S.C. § 1362(12). Since the city's landfill caused pollutants to enter Beaver Pond, and since these pollutants were then conveyed into the rest of the Intervale by the railroad culvert, the district court's conclusion that the city discharged pollutants into navigable waters from a point source properly applied the statute to findings that were not clearly erroneous.

C. *Imminent and Substantial Endangerment*

■ The city next challenges the district court's conclusion that the landfill may present an imminent and substantial endangerment to health or the environment. It asserts that there is no evidence to support the court's conclusion, because (1) the mere presence of chemicals found on the list of toxins, without regard to their concentrations, does not evidence an endangerment; (2) the state environmental investigation

concluded that the landfill and its leachate did not present an imminent and substantial endangerment to the environment; and (3) plaintiffs' expert, Dr. Reed, did not cite evidence in support of his opinion. We disagree with the city's contention that the district court erred.

Section 6972(a)(1)(B) authorizes citizens to sue an owner or operator of a disposal facility which has contributed or is contributing to the past or present "disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). When congress enacted RCRA in 1976, it sought to close "the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes." H.R.Rep. No. 1491, 94th Cong., 2d Sess. 4, *reprinted in* 1976 U.S.C.C.A.N. 6238, 6241. RCRA's waste management requirements for disposal facilities are designed not only to prevent, but also to mitigate, endangerments to public health and the environment. *See id.*

■ Significantly, congress used the word "may" to preface the standard of liability: "present an imminent and substantial endangerment to health or the environment". *United States v. Price*, 688 F.2d 204, 213 (3d Cir.1982); *United States v. Waste Industries, Inc.*, 734 F.2d 159, 166 (4th Cir.1984). This is "expansive language", which is "intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes." *Price*, 688 F.2d at 213–14 (emphasis added). *See also Middlesex County Board of Chosen Freeholders v. New Jersey*, 645 F.Supp. 715, 722 (D.N.J.1986); *United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361, 1393 (D.N.H.1985).

■ The statute is "basically a prospective act designed to prevent improper disposal of hazardous wastes in the future". *Waste Industries*, 734 F.2d at 166 (quoting H.R. Committee Print No. 96–IFC 31, 96th Cong., 1st Sess. at 32 (1979) ("the Eckhardt Report")). It is not specifically

limited to emergency-type situations. *Waste Industries*, 734 F.2d at 165. A finding of "imminency" does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present: "An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public." *Environmental Defense Fund v. Environmental Protection Agency*, 465 F.2d 528, 535 (D.C.Cir.1972) (quoting EPA Statement of Reasons Underlying the Registration Decisions); *Ottati & Goss*, 630 F.Supp. at 1394. Imminence refers "to the nature of the threat rather than identification of the time when the endangerment initially arose." *Price*, 688 F.2d at 213 (quoting the Eckhardt Report); *Waste Industries, Inc.*, 734 F.2d at 166.

■ In addition, a finding that an activity may present an imminent and substantial endangerment does not require actual harm. *United States v. Waste Industries, Inc.*, 734 F.2d 159 (4th Cir.1984). Courts have consistently held that "endangerment" means a threatened or potential harm and does not require proof of actual harm. *Ottati & Goss*, 630 F.Supp. at 1394; *United States v. Vertac Chemical Corp.*, 489 F.Supp. 870, 885 (E.D.Ark.1980). *See also Ethyl Corp. v. EPA*, 541 F.2d 1, 13 (D.C.Cir.) (en banc), *cert denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976) ("[c]ase law and dictionary definition agree that endanger means something less than actual harm").

The evidence presented at trial supports the district court's finding that the landfill presented an imminent and substantial endangerment to health and the environment. The landfill had been leaking hazardous chemicals into the soil, into groundwater beneath and to the north of the landfill, and into surface waters of the Intervale wetland. Even after installation and operation of the leachate collection system in 1986, at least 10 percent of the leachate, which contains toxic and hazardous chemicals, was still migrating from the landfill into the groundwater and surface water in and around the landfill. Standard bioassay techniques revealed that leachate from the landfill was toxic to freshwater aquatic life, including at least one vertebrate in the food chain. At the time it last assessed the landfill on September 21, 1988, the state determined that "the Burlington Landfill has inadequate separation distance to groundwater and inadequate isolation distance to surface water. Monitoring of both groundwater and surface water has indicated impacts to water quality."

The amount and presence of toxic chemicals, including lead, found in groundwater wells have increased over time, and are bio-accumulating in the Intervale. Some of these toxic chemicals, which continue to migrate from the landfill, may have a dramatic, adverse impact on the food chain in the Intervale. While the cattails in the Intervale tend to be resistant to toxic chemicals, the marsh is a "climax" system, *i.e.*, cattails can stand in the face of chemical insult, but when deterioration of them finally can be seen, they will degrade quickly, and that will be "long past the point * * * of saving the system."

In addition, the district court based its finding on (1) the fact that leachate which escaped from the landfill contained chemicals and compounds found on the EPA toxic list; (2) the fact that the state, on the basis of its independent environmental investigation in and around the landfill, had concluded that January 1, 1990, was an appropriate closing date for the landfill; and (3) "other evidence in this case, such as Dr. Reed's expert opinion".

Based on all of the foregoing, the district court properly concluded that there were sufficient circumstances that may present an imminent and substantial endangerment to health or the environment.

### D. *Attorney's Fees*

We now consider the city's claim that the district court abused its discretion in awarding attorney's fees. The district court awarded total attorney's fees in the amount of $247,534.37, which included a "lodestar" amount of $198,027.50 plus a 25 percent risk/contingency enhancement of $49,506.87. It also allowed $10,929.66 in expenses, including expert fees.

The city argues first that the plaintiffs were not prevailing parties or substantially prevailing parties, as required by the statute. *See* 42 U.S.C. § 6972; 33 U.S.C. § 1365. Second, the city argues that, even if the plaintiffs were prevailing parties, the district court erroneously awarded their attorneys the full amount of the fee requested, without a downward adjustment for limited success. Finally, the city argues that, at the very least, the 25 percent enhancement was error. We consider each of these claims in turn.

 Although we note that most of the cases cited involve the Attorney's Civil Rights Fee Awards Act, 42 U.S.C. § 1988, the principles governing fee awards under that act are applicable to the attorney's fee provisions before us because of their substantially similar language. *See Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*).

### 1. Prevailing Party

 Both RCRA and the CWA provide for an award of a reasonable attorney's fee "to the prevailing party or substantially prevailing party, whenever the court determines such an award is appropriate." 42 U.S.C. § 6972; 33 U.S.C. § 1365. The first hurdle for plaintiffs seeking a fee award is the requirement that they be prevailing parties. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). To qualify, a plaintiff must " 'succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.' " *Id.* (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)). *See also Texas State Teachers' Assn. v. Garland Independent School District,* 489 U.S. 782, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989) (rejecting "central issue" test and reaffirming "significant issue" test). This test has been characterized as a "generous formulation" to get plaintiffs across the statutory threshold. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939.

Even with this broad interpretation, however, a plaintiff must "receive at least some relief on the merits of his claim before he can be said to prevail." *Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 2675, 96 L.Ed.2d 654 (1987). He "must be able to point to a resolution of the dispute which changes the legal relationship between [himself] and the defendant." *Texas Teachers,* 109 S.Ct. at 1493; *Hewitt,* 482 U.S. at 760–61, 107 S.Ct. at 2675–76; *Rhodes v. Stewart,* 488 U.S. 1, 109 S.Ct. 202, 203, 102 L.Ed.2d 1 (1988). "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Texas Teachers,* 109 S.Ct. at 1493. Thus, success on legal claims that are "purely technical or *de minimis*" should not result in fee awards. *Id.*

 We do not accept, however, the city's characterization of the plaintiffs' success in this case as "purely technical or *de minimis*". Under the *Texas Teachers* standard, the city argues, we should not only compare the relief obtained with the relief sought, but also, compare the city's legal obligations before commencement of litigation with its obligations after the district court's judgment. According to the city, plaintiffs did nothing to change the status quo, because its legal obligations had already been fixed by the Assurance of Discontinuance that was entered as an order of the state court.

Although the district court's judgment contains essentially the same remedy as the Assurance, in that both of them mandate closing the landfill by 1990, the plaintiffs did "prevail" in this action, within the federal statutory definition, because, in large part, it was the pressure generated by the plaintiffs' efforts here that caused the city to actually close the landfill.

The city had been granted extension after extension postponing the initial deadline specified in the original Assurance. The Amended Assurance was one in a series of many. The city should have closed the landfill by January 1, 1988, because it did not opt for a resource recovery facility.

Instead, the city obtained more extensions and continued to operate the facility for two more years. In fact, until trial in the court below of the federal statutory claims, the city would not even concede either that the decomposition of garbage in the landfill caused the pre-December 27, 1985 explosive levels of methane gas at the landfill boundary, or that leachate, which escaped the leachate collection system, was migrating beyond the landfill boundary.

Only by bringing this suit against the city were the plaintiffs finally able to get from the city action as opposed to mere promises. "The real value of the judicial pronouncement * * * is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff."* *Hewitt,* 482 U.S. at 761, 107 S.Ct. at 2676 (emphasis in original). *See also Rhodes v. Stewart,* 488 U.S. 1, 109 S.Ct. 202, 203, 102 L.Ed.2d 1 (1988). We are satisfied that the plaintiffs have achieved a significant vindication of their rights under federal law as a result of this lawsuit. *Gingras v. Lloyd,* 740 F.2d 210, 212 (2d Cir.1984).

Despite the city's assertion that such reasoning is speculation, we do not think that the district court's finding that the plaintiffs "prevailed" under the circumstances of this action is clearly erroneous. A determination by the court that the city had violated provisions of RCRA and the CWA constitutes a change in the legal relationship of the parties that goes beyond what was contained in the Assurance.

### 2. Fully Compensatory Lodestar

 The city's other arguments relate to "the degree of the plaintiff's overall success [which] goes to the reasonableness of the award under *Hensley,* not to the availability of a fee award *vel non." Gingras,* 740 F.2d at 212. The district court awarded plaintiffs' attorneys the full fee requested, which covered all time spent on all aspects of the case. It found that both the hourly rate requested and the hours expended were reasonable in light of the complexity of the litigation. The city argues that the district court erred by not limiting its award to an amount commensu-

rate with the plaintiffs' limited success. The city claims that the award erroneously included time spent on the failed arguments on the RCRA permitting and notification requirements; the failed effort to have the landfill declared an open dump; the failed effort to obtain a preliminary injunction; the unsuccessful interlocutory appeal to this court from the order denying the preliminary injunction; and all work done on the pendent state claims for which no fees may be awarded.

 Because we think there is sufficient basis for the district court's findings, we hold that the court did not abuse its discretion in awarding plaintiffs' attorneys a fully compensatory fee award. Once a party is deemed to have prevailed, a "reasonable attorney's fee" is to be determined in the exercise of the district court's discretion. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941.

 The starting point for calculating a reasonable attorney's fee is "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984); *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. Adjustments to that initial estimate can be made by considering the special circumstances of each particular case. *Blanchard v. Bergeron,* 489 U.S. 87, 94, 109 S.Ct. 939, 944, 103 L.Ed.2d 67 (1989); *Blum,* 465 U.S. at 888, 104 S.Ct. at 1544. However, there is a presumption that the lodestar figure is reasonable. *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548.

 Although "the most critical factor is the degree of success obtained", *Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941, where a case presents a common core of facts and related legal theories, district courts should "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at 435, 103 S.Ct. at 1940. *See also Dominic v. Consolidated Edison Co. of New York, Inc.,* 822 F.2d 1249, 1259 (2d Cir.1987). When the issues are intertwined factually, a fully compensa-

tory fee award is justified even where a plaintiff does not prevail on all his claims or obtain all relief requested in his complaint. *Dominic*, 822 F.2d at 1259.

When some reduction is called for, a district court generally will attempt either "to identify specific hours that should be eliminated or * * * simply reduc[e] the award to account for the limited success of the plaintiff." *Texas Teachers*, 489 U.S. at 790, 109 S.Ct. at 1492 (citing *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941). However, reductions are not always required when plaintiffs fail to succeed on every issue. Here, the district court did not abuse its discretion by determining that the complexity of this case justified a fully compensatory award. Nor did the district court err by rejecting the city's efforts to trivialize the plaintiffs' success. There is no mathematical formula by which to compare the total number of issues with the number of issues prevailed upon. *Hensley*, 461 U.S. at 436 n. 11, 103 S.Ct. at 1940 n. 11. All of plaintiffs' claims arose from the operation of a single facility and were "based on related legal theories." *Dominic*, 822 F.2d at 1259. There was simply no need for the district court to engage in an "artificial distribution" of attorney time between successful and unsuccessful claims. *Id.* Its lodestar award of $198,027.50 was, under the circumstances of this case, fully justified.

### 3. 25 Percent Enhancement for Contingency/Risk

■ Finally, the city challenges the district court's grant of a 25 percent enhancement to its fully compensatory award of attorney's fees. Relying upon the contingency/risk factor, the district court found that the enhancement was justified under the circumstances of this case.

■ In *Hensley*, the Supreme Court stated that "in some cases of exceptional success an enhanced award may be justified." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. Since this general declaration, however, the Court has gradually narrowed the circumstances under which an enhancement might be appropriate. An enhance-

ment is no longer justified on the basis of factors such as the novelty of the issues, the complexity of the litigation, the high quality of the representation, or the number of people benefited. *Blum*, 465 U.S. at 898–900, 104 S.Ct. at 1548–1550; *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*). All these factors are considered subsumed in the calculation of the lodestar, because they are deemed to be adequately reflected in the hourly rate and the number of hours expended on the litigation. *Blum*, 465 U.S. at 898–900, 104 S.Ct. at 1548–1550; *see also Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. at 3098.

■ The enhancement possibility suggested by *Hensley* has thus eroded to the point where apparently the only thing that may still justify an enhancement is the contingency/risk factor. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("*Delaware Valley II*"). In *Delaware Valley II*, the Court grappled with the question of whether and when the risk of nonpayment could be considered in granting an enhancement to a fee award. The Court concluded that no upward adjustment was justified in that case, but the issue sharply divided the Court, resulting in an inconclusive 4–1–4 decision.

Four justices flatly rejected any multipliers or enhancements to the lodestar figure to compensate for the risk of loss under fee-shifting statutes. *Delaware Valley II*, 483 U.S. at 725–26, 107 S.Ct. at 3086–87. Justice O'Connor concurred in finding that no enhancement could be granted in the case, but refused to flatly reject multipliers in all cases. *Id.* at 731, 107 S.Ct. at 3089 (O'Connor, J., concurring). She felt that contingency enhancements were appropriate in some circumstances, but in a narrower class of cases than the dissent would allow. *Id.* In addition to the requirements expressed by the dissent, Justice O'Connor would also require that plaintiffs "establish that without an adjustment for risk the prevailing party 'would have faced substan-

tial difficulties in finding counsel in the local or other relevant market.' " *Id.* at 733, 107 S.Ct. at 3090. The other four justices held that courts could award contingency enhancements if the plaintiff could establish that the case was taken on a contingent basis and that the plaintiff's attorney had been unable to mitigate the risk of nonpayment either through extracting some significant partial payment from the client or through signing on for a large prospective damage award. *Id.* at 735, 107 S.Ct. at 3091 (Blackmun, J., dissenting).

Given the outcome in *Delaware Valley II*, we do not view any one of the three separate opinions dispositive on the issue before us today. We note that one of the justices that heard the case is no longer on the Court. While some courts view Justice O'Connor's concurring opinion as being the controlling law, *see, e.g., Alberti v. Klevenhagen*, 896 F.2d 927 (5th Cir.1990); *Spell v. McDaniel*, 824 F.2d 1380, 1404 (4th Cir. 1987); *Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir.1990); *Student Public Interest Research Group v. AT & T Bell Laboratories*, 842 F.2d 1436, 1451 (3d Cir.1988); *McKenzie v. Kennickell*, 875 F.2d 330 (D.C.Cir.1989); *Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 53 n. 6 (D.C.Cir.1987); *Lattimore v. Oman Construction*, 868 F.2d 437, 439 (11th Cir. 1989), we disagree. Apart from the anomaly of the views of one justice, with whom no one concurs, being the law of the land, where the Court is so divided on an issue and where there is no majority opinion at all, we conclude that the issues of whether and when a contingency enhancement is warranted are open issues for the Supreme Court yet to decide. Thus, we are left with our own holding in *Friends of the Earth v. Eastman Kodak Co.*, 834 F.2d 295 (2d Cir. 1987), which affirmed the approach we took in *Lewis v. Coughlin*, 801 F.2d 570, 576 (2d Cir.1986).

Judge Billings, therefore, correctly relied on *Friends of the Earth*, where we stated that the critical inquiry was "whether '[w]ithout the possibility of a fee enhancement * * * competent counsel might refuse to represent clients thereby denying them effective access to the courts.' " *Id.*

at 298 (quoting *Lewis v. Coughlin*, 801 F.2d 570, 576 (2d Cir.1986)). Applying this standard, Judge Billings found that under the fee arrangements here, plaintiffs' attorneys would not have been compensated at all unless plaintiffs had prevailed, and that the risk of not prevailing was substantial. After considering the memoranda and affidavits on file, the court also found that absent an opportunity for enhancement to balance the risk of losing entirely, plaintiff would have faced substantial difficulty in obtaining counsel of reasonable skill and competence for this difficult case in a complicated field of law. In light of these findings, the district court determined that a 25 percent enhancement was appropriate to attract competent counsel without providing a windfall. Because the court's findings are not clearly erroneous, the district court was justified in concluding that the plaintiffs' attorneys were entitled to a 25 percent enhancement.

## CONCLUSION

We affirm the judgment of the district court in all respects.