UNITED STATES of America, Plaintiff,

v.

Geronimo VILLEGAS, Defendant.

No. 89 CR 338.

United States District Court,
E.D. New York.

Dec. 13, 1991.

Andrew J. Maloney, U.S. Atty. by Robin L. Greenwald, Asst. U.S. Atty., Peter Ginsberg, Brooklyn, N.Y., for plaintiff.

Vivian Shevitz, New York City, for defendant.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

On May 26, 1988, a teacher at the Saint John's Lutheran School took her eighth grade class on a field trip to the Alice Austin House, a museum on Staten Island that overlooks Pebble Beach on the Hudson River. While playing on the beach after touring the museum, the students came upon numerous glass vials containing what appeared to be human blood lying in the sand. The New York City Sanitation Department later collected approximately seventy of these vials scattered along the shoreline and floating in the incoming tide. The broken remains of others were found among clusters of rocks in the shallow water. Tests later revealed that five of the vials contained blood infected with hepatitis B, an infectious virus that causes inflammation of the liver and can lead to chronic illness, including cancer, or to death.

Four months later, a maintenance employee at the Admirals Walk Condominium Association (Admirals Walk), an apartment complex bordering the Hudson River in Edgewater, New Jersey, noticed a plastic bag full of blood vials wedged into the rocks of the river bulkhead. Edgewater Police Officers eventually collected at least one hundred vials floating loosely in the river or packed in containers wedged into the bulkhead. Fifty-five of these vials were tested for disease and at least five were found to be infected with hepatitis B.

State investigators traced the vials by the identifying information on their labels to Plaza Health Laboratories, a facility that tests blood for disease and other medical conditions in Brooklyn, New York. The defendant, Geronimo Villegas, was co-own-er of Plaza and lived at the Admirals Walk complex when the vials were found. When questioned by state investigators, Mr. Villegas admitted to placing vials in the bulkhead in June, 1988 to make room in his laboratory for incoming blood samples. Although he did not admit to hiding vials there on an earlier occasion, expert evidence on tides and currents established that the vials found in Staten Island could also have originated from the Admirals Walk bulkhead.

On January 31, 1991, a jury found Mr. Villegas guilty of four counts charging violations of the Clean Water Act (33 U.S.C. § 1319). All four counts are premised on the allegation that the defendant knowingly discharged pollutants into navigable waters from a "point source," a term of art established and defined by the Clean Water Act. See 33 U.S.C. § 1362(14). Two of the four convictions (Counts One and Three) are premised on the so-called "knowing endangerment" provision of this statute that imposes substantially enhanced penalties on polluters who knowingly place others "in imminent danger of death or serious bodily injury." 33 U.S.C. § 1319(c)(3).

■ In a post-trial motion pursuant to Fed.R.Crim.P. 29(c), Mr. Villegas challenges the sufficiency of the evidence supporting all four convictions. The motion for a judgment of acquittal is granted with respect to Counts One and Three, but denied as to Counts Two and Four.[1]

### Discussion

This case involves difficult questions of statutory construction that arise primarily from the effort of the United States Attorney to apply the Clean Water Act to circumstances that Congress may not have specifically contemplated when it enacted this statute. Only recently, Judge Posner aptly described the task of a judge faced with such a problem:

---

**1.** The defendant also argues for the first time that the proper venue for the trial of the indictment was the District of New Jersey. A claim that evidence is insufficient to sustain venue, if not raised in a pre-trial motion or as a specific basis for a judgment of acquittal at the close of the case-in-chief, is deemed waived. See *United States v. Price,* 447 F.2d 23, 27 (2d Cir.), *cert. denied,* 404 U.S. 912, 92 S.Ct. 232, 30 L.Ed.2d 186 (1971).

When a court can figure out what Congress probably was driving at and how its goal can be achieved, it is not usurpation—it is interpretation in a sense that has been orthodox since Aristotle—for the court to complete (not enlarge) the statute by reading it to bring about the end that the legislators would have specified had they thought about it more clearly or used a more perspicuous form of words.

*Friedrich v. City of Chicago*, 888 F.2d 511, 514 (7th Cir.1989), *vacated*, —— U.S. ——, 111 S.Ct. 1383, 113 L.Ed.2d 440 (1991). The interpretive task is the same whether the statute is criminal or civil in nature.

While it is often said, and sometimes held, that ambiguity in a criminal statute should be resolved in favor of a defendant, the Supreme Court has cautioned—even when construing an arguably ambiguous statute—that such statutes " 'ought not to be construed so strictly as to defeat the obvious intention of the legislature.' " *Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 1272, 39 L.Ed.2d 782 (1974) (quoting *American Fur Co. v. United States*, 2 Pet. 358, 367, 7 L.Ed. 450 (1829)). Indeed, in a criminal prosecution under the Rivers and Harbors Act of 1899, the Supreme Court rejected a persuasive argument by Justice Harlan to "[apply] a seemingly straight-forward statute in a straightforward way". *United States v. Standard Oil Co.*, 384 U.S. 224, 236, 86 S.Ct. 1427, 1433, 16 L.Ed.2d 492 (1966) (Harlan, J., dissenting). Instead, the Court broadly construed the statute in a manner consistent with its purpose. Justice Douglas, writing for the majority, observed:

This case comes to us at a time in the Nation's history when there is greater concern than ever over pollution—one of the main threats to our free-flowing rivers and to our lakes as well. The crisis that we face in this respect would not, of course, warrant us in manufacturing offenses where Congress has not acted nor in stretching statutory language in a criminal field to meet strange conditions. But whatever may be said of the rule of strict construction, it cannot provide a substitute for common sense, precedent, and legislative history.

*Id.* at 225, 86 S.Ct. at 1428. *See also United States v. Republic Steel Corp.*, 362 U.S. 482, 491, 80 S.Ct. 884, 889, 4 L.Ed.2d 903 (1960). These words provide an appropriate backdrop to the questions of statutory interpretation at issue here.

■ The first of these relates to all four counts of the indictment. The defendant's argument is a simple one. The Clean Water Act makes it an offense for any "person" to "discharge" a "pollutant" into "navigable waters" from a "point source." 33 U.S.C. § 1311(a). The phrase "point source" is defined in part as "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). This language, the defendant argues, demonstrates that a "point source" is the structure through which pollutants are discharged into navigable waters by persons. In this case, however, the defendant deposited the vials into the Hudson River without using a conveyance of any kind. Accordingly, he argues, he cannot be found guilty of discharging pollutants from a "point source." While this argument is not without some appeal, common sense, precedent and legislative history, suggest that in certain circumstances, a person can be a "point source."

Congress has defined a "point source" as "any discernible, confined and discrete conveyance, including, but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). This language is emphatically inclusive, as reflected in the words "any," "discernible" and "not limited to." Moreover, use of such a highly general term as "conveyance" establishes that Congress had an expansive vision of what would constitute a point source. The word conveyance is defined simply as "a means or way of conveying." Webster's New International Dictionary 499 (3d ed.

1981). Any conduit or container of waste falls directly within this definition.

The intent of Congress in using the phrase "point source" may be even more clearly ascertained from the distinction made in the statute, and emphasized in the legislative history and the case law, between "point sources" and "non-point sources." *See* 33 U.S.C. § 1314(f); S.Rep. No. 92–414, 92nd Cong., 1st Sess. (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3705–06, 3718–19, 3744. By non-point source pollution, Congress was referring to "disparate runoff caused primarily by rainfall around activities that employ or cause pollutants." *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979). Indeed, Congress specifically excluded from the definition of point source "return flows from irrigated agriculture." 33 U.S.C. § 1362(14). Thus, "[t]he concept of point source was developed to distinguish pollution resulting from simple erosion over the surface of the ground from pollution that has been collected or comes from a confined system." *Friends of Sakonnet v. Dutra*, 738 F.Supp. 623, 630 (D.R.I.1990).

If the purpose of Congress in specifically proscribing pollution from a "point source" was to ensure that naturally-induced, random run-off of pollutants would not result in criminal or civil liability under the Clean Water Act, then it is difficult to find a basis for holding that a "point source" does not encompass the deliberate discharge of pollutants produced in the course of a waste-generating activity merely because a person directly deposits those pollutants into the water. Indeed, the definition of "point source" in the Clean Water Act, even if read literally, does not exclude discharge by a person. While the words "any discernible, confined and discrete conveyance" do not conjure up the image of a human being, neither do they specifically exclude one. It is true that the examples included within the definition—"any pipe, ditch, channel, tunnel, well, discrete fissure, container, rolling stock, concentrated animal feeding operation or vessel or other floating craft from which pollutants may be discharged"—imply that the statutory reference is to some kind of physical container or conduit. Such an implication, however, is not dispositive. As the Supreme Court observed in *Gooch v. United States:*

> The rule of *ejusdem generis*, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty. Ordinarily, it limits general terms which follow specific ones to matters similar to those specified; but it may not be used to defeat the obvious purpose of the legislation. And, while penal statutes are narrowly construed, this does not require rejection of that sense of the words which best harmonizes with the context and the end in view.

297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936); *United States v. Alpers*, 338 U.S. 680, 682, 70 S.Ct. 352, 354, 94 L.Ed. 457 (1950).

The application of the rule of *ejusdem generis* to resolve the statutory questions presented here would "defeat the obvious purpose" of the Clean Water Act which is to prevent unregulated pollution of the navigable waters of the United States. *See* 33 U.S.C. §§ 1251, 1341–45. As the Court of Appeals for the Sixth Circuit has observed:

> "The touchstone of the regulatory scheme is that those needing to use the waters for waste distribution must seek and obtain a permit to discharge that waste, with the quantity and quality of the discharge regulated. The concept of a point source was designed to further this scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States."

*Earth Sciences*, 599 F.2d at 373.

Congress was concerned with the precise manner by which pollutants are discharged into navigable waters because of its intent to exclude certain types of pollution-generating activity from the ambit of the Clean Water Act. Where, as here, that concern is not implicated, there is no reason to limit the broad definition of the words Congress

employed. *Cf. Dague v. City of Burlington,* 935 F.2d 1343, 1354 (2d Cir.1991) ("The definition of a point source is to be broadly interpreted."), *petition for cert. filed,* (Nov. 18, 1991). Surely, it is absurd to argue that the defendant should be relieved of responsibility merely because he dumped vials of poison directly into the Hudson River instead of discharging them from a pipe or other physical conveyance.

Admittedly, there is an argument to be made that use of the phrase "point source" serves the purpose of limiting the coverage of the Clean Water Act to activities that generate and dispose of pollutants on a large-scale and continuous basis. Indeed, references in the statute and the legislative history indicate that the primary focus of the Act was industrial polluters. *See* 33 U.S.C. §§ 1341–45 (establishing a permit system to regulate waste discharge); S.Rep. No. 92–414, 92nd Cong., 1st Sess. (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668 (referring to "industry," "industrial sources," "facilities" and "plants"). Congress, however, did not exempt small-time, intermittent polluters from the regulatory scheme prescribed by the Clean Water Act. On the contrary, the statute defines "the discharge of a pollutant" as *any addition* of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12) (emphasis added). *See also United States v. St. Bernard Parish,* 589 F.Supp. 617, 621 (E.D.La.1984) (Intermittent discharges are not excluded from the Clean Water Act.).

Nevertheless, Congress did not intend the Clean Water Act to apply anytime a person throws garbage into the ocean merely because such litter may be encompassed within the broad statutory definition of a "pollutant." The scope of the Act may be limited, however, without creating arbitrary and irrational distinctions of the kind suggested by the defendant. Specifically, the phrase "point source" may reasonably be read to include any discrete and identifiable conduit or container—including a human being—designated to collect or discharge pollutants produced in the course of a waste-generating activity. This definition places the focus of the inquiry on whether a defendant was deliberately engaged in threatening the "chemical, physical and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), which is the object of the Clean Water Act, and not whether the conduit for such activity was a human being or an inanimate structure.[2]

The parties have framed the essential issue in this case as whether a person can be a "point source" and the issue has been addressed as so framed. At least as to Counts One and Two, however, there is an independent basis for concluding that the defendant discharged the blood vials from a "point source." Whether or not Mr. Villegas himself was a "point source," it is quite clear that the rocks forming the bulkhead at Admirals Walk come within the definition of that phrase. The crevices of the bulkhead literally constitute "discrete fissure[s]," one of the definitions of a point source specifically provided by the Clean Water Act. 33 U.S.C. § 1362(14). Indeed, the cases have consistently found that structures comprised of natural materials with the physical capacity to hold "pollutants" constitute point sources. *See Dague,* 935 F.2d at 1354–55 (a culvert is a point source); *United States v. Ottati & Goss, Inc.,* 630 F.Supp. 1361, 1401 (D.N.H. 1985) (a ditch is a point source); *Earth Sciences,* 599 F.2d at 374 (ditches form part of a point source); *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 165 (D.C.Cir.1982) (a dam can be a point source). The capacity and function of the structures in these cases cannot be distinguished from the crevices in the rocky fa-

---

2. During a post-trial argument, even the defendant's attorney appeared to adopt an analysis close to that suggested here:

> The Court: [I]s it your argument that it's not a point source because he only did it twice? Ms. Shevitz: It's my argument that it's not a point source because the car, the defendant, was not a confined, discrete source of pollu-

tion in terms of the ongoing nature of that plant.... In other words, if they regularly discharged their waste through a car that regularly drove from here to there, then I would say, okay, maybe that's an incident of the business, and that's a point source of that ongoing plant activity, ...

Post-trial Hearing Tr. at 85.

cade of the bulkhead that held the defendant's blood vials. Finally, even if the bulkhead does not constitute a "point source," the very containers holding the blood vials and hidden in the rocky facade come directly within the definition of that phrase. 33 U.S.C. § 1362(14) (point source is a "container").[3]

■ The defendant next argues that even if he is guilty of discharging pollutants from a "point source," the evidence is insufficient to support his convictions on Counts One and Three of the indictment. These counts charge violations of the knowing endangerment provision of the Clean Water Act that reads as follows:

> Any person who knowingly violates section 1311 ... of this title, ... and who *knows* at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more than $250,000 or imprisonment of not more than 15 years, or both.

33 U.S.C. § 1319(c)(3)(A). Under this section, the United States Attorney must prove that the defendant discharged pollutants from a point source, and that in doing so, he knew he was placing another person in imminent danger of death or bodily injury. The defendant argues that there is insufficient evidence to prove that when he placed the vials in the Hudson River he knew that he was thereby placing another person in "imminent danger of death or serious bodily injury."

Under the Clean Water Act's knowing endangerment provision, a person acts with the requisite degree of knowledge if he possesses "actual awareness" or an "actual belief" that he is placing another person in imminent danger. 33 U.S.C. § 1319(c)(3)(B). Circumstantial evidence may be used to prove either mental state. *Id.* Only one reported case refers to the Clean Water Act's knowing endangerment provision and it does not apply or further define the knowledge element. *See United States v. Rutana*, 932 F.2d 1155 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991).

The legislative history of the section, however, does address the issue. The Senate Environment and Public Works Committee emphasized the deliberate omission from § 1319(c)(3) of the definition of knowledge found in an analogous provision in the Resource Conservation and Recovery Act (RCRA). S.Rep. No. 99–50, 99th Cong., 1st Sess., at 30 (1985). Under the RCRA, "a person's state of mind is knowing with respect to a result of his conduct, if he is aware or believes that his conduct is *substantially certain* to cause danger of death or serious bodily injury." 42 U.S.C. § 6928(f)(1)(C) (emphasis added). According to the Senate Report, this language was left out of the Clean Water Act because it tended to "discourage prosecutions." S.Rep. No. 99–50, 99th Cong., 1st Sess., at 30 (1985). Instead, the Senate Committee intended that knowledge in the knowing endangerment provision of the Clean Water Act be "measured against the standard established by prevailing case law, as it is for any other Federal crime sharing the same state of mind element." *Id.*

The omission in the Clean Water Act of the RCRA's "substantial certainty" language, combined with the reference in the

---

**3.** The defendant argues that the containers and vials found at the Admirals Walk bulkhead in September, 1988, cannot provide the basis for a conviction because the point in the bulkhead at which they were found is above the normal high tide line. There was sufficient evidence, however, for the jury to conclude that the defendant knew that the vials would ultimately be washed into the water. Moreover, even if valid, this argument would affect only Counts One and Two. There is no evidence as to precisely how the vials that washed ashore on Staten Island in May, 1988 were discharged into the Hudson River. Under these circumstances, the jury could infer that the vials were either placed directly in the water or in the bulkhead below the normal high tide line. Because the defendant's sentence will be the same whether or not the convictions on Counts One and Two stand, there is no need to address the validity of the defendant's argument on this point. *See Barnes v. United States*, 412 U.S. 837, 848, 93 S.Ct. 2357, 2364, 37 L.Ed.2d 380 (1973); *Benton v. Maryland*, 395 U.S. 784, 791, 89 S.Ct. 2056, 2060, 23 L.Ed.2d 707 (1969).

legislative history to the "standard established by prevailing case law," leaves unclear precisely what evidence is necessary to sustain a conviction under 33 U.S.C. § 1319(c)(3). There does not appear to be any "prevailing [federal] case law," defining knowledge in this particular context. The Model Penal Code, the culpability standards of which have been adopted or used as a guide in numerous jurisdictions, *see* 1 Charles E. Torcia, Wharton's Criminal Law 137–40 (1978), provides that when knowledge of the result of one's conduct is an element of an offense, such knowledge is established if a person "is aware that it is *practically certain* that his conduct will cause such a result." Model Penal Code § 2.02(2)(b)(ii) (1962) (emphasis added). Moreover, one year after Congress amended the criminal provision of the Clean Water Act to include the knowing endangerment section, it enacted the Medical Waste Tracking Act. This Act also contains a knowing endangerment section that imposes enhanced penalties on violators who knowingly place another person in imminent danger of death or serious bodily injury. *See* 42 U.S.C. § 6992d(c). The knowing endangerment section of the Medical Waste Tracking Act, however, expressly returns to the knowledge standard of the RCRA, requiring proof that the defendant "is aware or believes that his conduct is *substantially certain* to cause danger of death or serious bodily injury." *Id.* ("The terms of this paragraph shall be interpreted in accordance with the rules provided under § 6928(f) of this title") (emphasis added).[4]

The United States Sentencing Commission has taken a similar approach in formulating the guidelines for the offense at issue here. The Commission provided for an eleven level increase from the base level offense of discharging or mishandling environmental pollutants "[i]f the offense resulted in a substantial likelihood of death or serious bodily injury," United States Sentencing Commission, *Guidelines Man-*

*ual,* § 2Q1.3 (Nov. 1991), and *if* the defendant knew that his discharge of pollutants would have this effect. *Id.,* at Comment. (n. 3).

Although the "substantially/practically certain" standard appears to be the predominant definition of knowledge with respect to the result of conduct, some states have opted for a "high probability" standard. In Montana, for example, the criminal code defines knowledge with respect to the result of conduct as being "aware that it is *highly probable* that such result will be caused" by the conduct. Mont.Code Ann. § 45–2–101(33) (1990) (emphasis added). A similar definition was adopted in *Armour v. State of Indiana,* 479 N.E.2d 1294 (Ind.1985), which involved the application of a child neglect statute that made it a crime to knowingly put a "dependent in a situation that may endanger his life or health." Ind.Code Ann. § 35–46–1–4 (Burns 1990). The Supreme Court of Indiana held that a defendant could be found guilty of violating the statute only if he was "subjectively aware of a *high probability* that he placed the dependent in a dangerous situation." *Armour,* 479 N.E.2d at 1297 (emphasis added). *See also Caldwell v. State of Indiana,* 497 N.E.2d 610 (Ind.Ct.App.1986); *Ware v. State of Indiana,* 441 N.E.2d 20 (Ind.Ct.App.1983).

Significantly, the "high probability" standard also tracks the language of the Model Penal Code as it defines knowledge of a fact inferred from a person's conscious avoidance of that fact. The Code states that "when knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a *high probability* of its existence, unless he actually believes it does not exist." Model Penal Code § 2.02(7) (1962) (emphasis added). The Supreme Court has expressly approved this language, *see Leary v. United States,* 395 U.S. 6, 46 n. 93, 89 S.Ct. 1532, 1553 n. 93, 23 L.Ed.2d 57 (1969), and it has been consistently accept-

---

4. Two federal statutes that impose sanctions for certain foreign trade practices also define knowledge of the result of conduct as being aware that "such result is *substantially certain* to

occur." 15 U.S.C.S. § 78dd–1(f)(2)(A)(i) (Law Co-op 1991); 15 U.S.C.S. § 78dd–2(h)(3)(A)(i) (Law Co-op 1991) (emphasis added).

ed by the Court of Appeals for the Second Circuit. *See, e.g., United States v. Gurary,* 860 F.2d 521 (2d Cir.1988), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989); *United States v. Gatzonis,* 805 F.2d 72 (2d Cir.1986), *cert. denied,* 484 U.S. 932, 108 S.Ct. 303, 98 L.Ed.2d 262 (1987); *United States v. Reed,* 790 F.2d 208 (2d Cir.), *cert. denied,* 479 U.S. 954, 107 S.Ct. 445, 93 L.Ed.2d 393 (1986).

■ The "high probability" standard provides a viable alternative to the "substantial certainty" test that Congress apparently rejected when enacting the Clean Water Act's knowing endangerment provision. It allows for conviction on proof less than knowledge of a substantial certainty of imminent danger, while also setting a sufficiently rigorous standard to justify the stiff criminal penalties that attach pursuant to § 1319(c)(3). More significantly, it is consistent with the language of 33 U.S.C. § 1319(c)(3) that provides for an enhanced sentence only where "at [the] time" the defendant discharges a pollutant into navigable waters he "knows ... that he thereby places another person in imminent danger of death or serious bodily injury."

These words imply that the discharge must actually place another person in imminent danger of death or serious bodily injury and not merely that such result be a "potential" consequence of the defendant's act. *See* Govt.Br. at 40. Indeed, unless so read, the word "imminent" has no meaning at all. Cases have held that the phrase "imminent danger" does not mean immediate danger. *Dague,* 935 F.2d at 1355–56. Because the word danger means risk or peril, Webster's New International Dictionary 573 (3d ed. 1981), the phrase "imminent danger" must connote something more than the mere possibility or risk that death or serious bodily injury is a foreseeable consequence of a discharge. Thus, at

the very least, "imminent danger" must mean danger that is a highly probable consequence of a discharge. *Cf.* United States Sentencing Commission, *Guidelines Manual,* § 2Q1.3 (Nov. 1991). It is this particular level of danger that the defendant must have known existed when he discharged the blood vials into the Hudson River.[5] *Id.* at Comment. (n. 3).

The United States Attorney offered three sources of testimony on the element of the defendant's knowledge. Elena Ramos, a former data entry employee at Plaza, testified that Mr. Villegas had worked in two laboratories that handled blood before becoming co-owner and vice-president of marketing at Plaza. She also testified that Mr. Villegas handled blood samples regularly and took precautions when doing so. Shahid Mustaquim, a former medical technologist at Plaza, testified that between 35–50% of the blood specimens brought there were tested for hepatitis. He further stated that Plaza has set aside a separate area and a separate machine for hepatitis testing. Dr. Sashikale Krishnan, former director of pathology at Plaza, confirmed that Plaza conducted a great deal of testing for diseases like hepatitis and leukemia. He also stated that Mr. Villegas was one of two people in charge of Plaza, that he co-authored the laboratory's safety manual, which included guidelines for handling blood, and that these guidelines were followed by Plaza employees.

This evidence is sufficient to support a jury finding that the defendant acted with knowledge of the dangers of hepatitis, and that some of the discharged vials contained hepatitis-infected blood. The evidence, however, does not support the conclusion that when he placed the vials in the Hudson River, Mr. Villegas knew there was a high probability that he was thereby placing another person in imminent danger of death or serious bodily injury. Of particu-

---

5. When this issue first arose at trial, at a point when there was little opportunity for careful research and review, I held that a lesser degree of probability would suffice. Upon reconsideration, I conclude otherwise. If I am now correct in concluding that the defendant must have been aware that it was highly probable that his conduct would cause serious bodily injury or death, but wrong in my evaluation of whether the evidence here is sufficient to meet that standard, I would grant the defendant's motion for a new trial pursuant to Fed.R.Crim.P. 33 because my instructions to the jury were erroneous. *See* Fed.R.Crim.P. 29(d).

lar significance is the testimony of Dr. Alfred M. Prince, an expert in virology called by the United States Attorney. Dr. Prince suggested that the principal risk of hepatitis infection as a result of exposure to a vial of contaminated blood would arise "[i]f that vial is broken and if a piece of broken glass were to penetrate the skin ..." Trial Tr. at 362. While Dr. Prince testified that the likelihood of contamination in those circumstances was "very high," *id.*, he also testified that the risk of this happening was "low":

> The Court: Doctor, if three or four or five vials like—of the kinds we have been talking about were dropped in the Hudson River, would you say that that would place any person in imminent danger of death or serious bodily injury?
>
> Dr. Prince: If those vials were to land on the shore and someone were to step on them and puncture their skin, they would be in danger of infection, hepatitis B, yes. Those vials that were infected, of course. They all were not.
>
> The Court: Of course, one would have to know that that was going to happen. Or sooner or later everything floats to shore?
>
> Dr. Prince: The risk of this happening is low but it is a risk.

Trial Tr. at 371.

This testimony was elicited outside the presence of the jury, and the defendant's trial counsel declined an invitation to have it repeated to the jury.[6] Nevertheless, the testimony does suggest the need for caution in inferring that the defendant must have known that he was placing another person in imminent danger of death or serious bodily injury merely because he knew that the vials contained a dangerous virus. Yet this is essentially the theory underlying the prosecution's case. The Assistant United States Attorneys trying the case argued that "from the evidence regarding the currents and tides the jury could infer that the defendant knew or should have known that the—anything thrown into

[the] waters would be swept out into the sea and eventually be lodged on a beach," and that the defendant "knew that people walked on the rocks [at] Edgewater." Trial Tr. at 391. Consequently, they argued, the defendant should have been aware of the risk to those who walk along Hudson River beaches or climb on the Admirals Walk bulkhead.

There was, however, no evidence introduced at trial showing that the defendant knew "that people walked on the rocks [at] Edgewater" where the vials were hidden, or that such activity even occurs. Moreover, there was no evidence introduced that showed the defendant's knowledge of the tides and, specifically, that the vials would be swept out into the sea and eventually wash ashore in an area where they could cause the kind of injury Dr. Prince described. Indeed, if Dr. Prince, an expert in virology who has a more sophisticated understanding of these matters than Mr. Villegas, viewed the danger of such serious bodily injury or death as remote, it is hard to know why Mr. Villegas should have known it to be highly probable or even likely.

There is no doubt that the defendant's conduct was irresponsible and that it had the potential to cause serious bodily injury. These factors may provide a basis for an upward adjustment of the guideline range applicable to the offense of discharging pollutants into the water. *See* United States Sentencing Commission, *Guidelines Manual*, § 2Q1.3, comment. (n. 4) (Nov. 1991). The evidence, however, is insufficient to justify the enhanced penalties provided for cases where a polluter knows that there is a high probability that he is placing another person in imminent danger of death or serious bodily injury.

### Conclusion

Accordingly, the defendant's motion pursuant to Fed.R.Crim.P. 29(c) is granted with respect to Counts One and Three and

---

6. Wayne Pizzuti, another prosecution expert, testified in the presence of the jury that it was also unlikely that a person swimming in the area where a vial had broken would contract hepatitis B. Trial Tr. at 356.

denied with respect to Counts Two and Four.

So Ordered.