**UNITED STATES of America, Appellee,**

v.

**David W. BOLDT, Defendant, Appellant.**

**No. 90–1454.**

United States Court of Appeals, First Circuit.

Heard Feb. 5, 1991.

Decided April 3, 1991.

---

Owen S. Walker, Federal Defender Office, for defendant, appellant.

Richard E. Welch, III, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief for appellee.

Before BREYER, Chief Judge, CAMPBELL and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

This is an appeal from a judgment of conviction, following a jury trial, of two counts relating to the discharge into a city sewer of industrial wastewater containing excessive metals. David Boldt raises five issues on appeal: (1) insufficiency of the evidence; (2) improper impeachment of a character witness; (3) improper comment in the prosecutor's closing argument; (4) prejudicial jury instruction; and (5) sentencing error. We affirm the conviction and sentence.

## BACKGROUND

Boldt was one of four defendants named in a 52–count indictment charging numerous violations of the federal Clean Water Act, 33 U.S.C. § 1251 *et seq.*, at Astro Circuit Corporation where defendants were management employees. Astro manufactured printed circuit boards using an electroplating process. Astro's manufacturing plant was located in Lowell, Massachusetts, until February 1988, when the company declared bankruptcy and went out of business.

The Clean Water Act and its implementing regulations require circuit board manufacturers to pretreat their industrial waste in order to remove toxic metals such as copper before discharging that waste into a city sewer system. 33 U.S.C. § 1317(b); 40 C.F.R. § 413.84(c); *see Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 119, 105 S.Ct. 1102, 1104, 84 L.Ed.2d 90 (1985). Astro's pretreatment facilities were completely inadequate. The system, installed in 1980, contained two components. One was a continuous flow system designed to treat 45 gallons per minute of wastewater. By 1987 the system was handling approximately 90 gallons per minute, twice the designed capacity. The company's routine practice when a failure occurred was to bypass the system, thus putting untreated wastewater directly into the city sewer.

Whereas the ordinary continuous flow treatment system handled the bulk of Astro's wastewater, the electroless copper waste was processed in a special batch system. When a large storage tank became full, the contents were treated by adding a caustic solution, which caused the copper to sink to the bottom so that the water could be drained off the top. The batch system usually, but not always, worked successfully.

David Boldt began working for Astro as Chemical Engineering Manager on June 26, 1987. Boldt's main responsibility was to keep the chemical production line running. Among his duties were supervision and management of Astro's pretreatment process, which was part of the company's pollution control department. Boldt worked for Astro for only six months; he was fired on January 8, 1988.

Boldt was charged with six counts of violating the Clean Water Act, 33 U.S.C. § 1319(c), by knowingly discharging, into a municipal sewer, industrial wastewater which contained excessively high concentrations of toxic metals in violation of the federal industrial pretreatment standards. The court entered a judgment of acquittal on one count, which was based on a discharge on the day Boldt lost his job, and the jury acquitted Boldt of three counts. The counts on which Boldt was convicted, numbered 8 and 12 in the indictment, involved two separate incidents. Count 8 charged that Boldt knowingly aided and abetted the discharge of pollutants on September 21, 1987, a date when the copper level in Astro's effluent exceeded the feder-

al regulation by nearly four times. The high reading resulted from a failure of Astro's continuous flow wastewater treatment system, causing the company to bypass the system. It appears from the testimony that Boldt was informed of the bypass on this date and did not act to stop it. The company received a letter from the City of Lowell dated September 30 informing the company of the violation. Astro's president asked Boldt to respond. Boldt's reply to the city stated in part:

On the date in question, we experienced a failure of two of our liquid transfer pumps, resulting in a serious flood (fully contained) in a portion of our waste treatment area. In order to remove the floodwaters so as to protect electrical equipment and controls and permit maintenance access, it was necessary to transfer these wastewaters into the treatment systems at a higher-than-normal rate.

It is our belief that this clean-up effort caused a temporary overload of the system. Effluent analysis for copper performed later in the day showed normal values for copper, well within limits.

Every effort is being made to prevent a recurrence of this problem.

The government alleged that this letter was misleading and false in that it failed to mention the almost daily bypassing of the pretreatment system at Astro, nor did it mention that the company had consistently found high amounts of copper in its effluent. Instead, the letter created the impression that the September 21 copper levels resulted from an unusual event.

Count 12 of the indictment, the other count on which Boldt was convicted, charged a violation of the Clean Water Act on January 7, 1988. On that evening, the lines feeding a caustic solution to a large batch treatment tank became clogged. Boldt's subordinate, James Swift, went to Boldt for advice. Boldt ordered Swift to add manually a caustic chemical to the tank. This treatment was unsuccessful. Boldt then ordered Swift to dump the entire contents of the tank—3,100 gallons of partially treated wastewater—into the city sewer.

According to Swift, Boldt then prepared a false written explanation concerning this incident and had Swift sign it. This memo, which was never located, was given to Astro's vice president. The next day, however, having second thoughts, Swift went to the vice president with an accurate statement of the event. Later that day Boldt was fired.

Boldt testified at trial that on January 7 he felt himself caught "between the devil and the deep blue sea." He had learned that the storage tank for the next batch of copper wastewater was full and would start overflowing soon, in which case the overflow would automatically be pumped directly to the sewer without any treatment at all. Under the circumstances, Boldt decided that it would be better to send the partially treated wastewater into the sewer rather than to allow the untreated solution to overflow. He denied that he had tried to cover up the dump.

Boldt's three co-defendants, his two supervisors and his predecessor at Astro, pled guilty, so Boldt was the only defendant to stand trial. The main issue at trial was the extent to which Boldt was culpable for admitted wastewater violations by Astro. Boldt's defense was that he was not directly responsible for discharging any of the illegal wastewater except on the January 7 occasion. The court gave Boldt's requested jury instruction of impossibility: that Boldt was not liable for violations if, despite exercising extraordinary care with respect to pollution, he was unable to prevent the violations because of the condition of the corporation or because of his relative power or position within the corporation. As to the January 7 count, Boldt took responsibility for the discharge, but used a defense of necessity. The court instructed the jury that Boldt was not liable if this discharge was necessary to avoid a worse harm.

## SUFFICIENCY OF THE EVIDENCE

In reviewing the record for a sufficiency of the evidence appeal, it is well established:

that the evidence must be examined in its entirety in the light most favorable to the Government to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt and that the Government may prove its case by circumstantial evidence that need not exclude every reasonable hypothesis of innocence.

*United States v. Van Helden*, 920 F.2d 99, 101 (1st Cir.1990); *United States v. Smith*, 680 F.2d 255, 259 (1st Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983); *see also United States v. Greer*, 850 F.2d 1447, 1450–53 (11th Cir. 1988) (discussing sufficiency of the evidence in the context of illegal hazardous waste dumping). Applying this standard, we conclude that although the evidence in this case was not overwhelming, it was sufficient to permit a reasonable jury to find guilt beyond a reasonable doubt.

The evidence showed that pollution control was part of Boldt's area of responsibility. On Count 8, the evidence showed that Boldt was aware of the practice of bypassing the pollution control system and had condoned it on the occasion at issue. He also authored a letter to the City of Lowell which could be construed as misleading. As to Count 12, there is no dispute that Boldt directly ordered his subordinate to dump the copper wastewater. There was also testimony from the subordinate that Boldt attempted to cover up the incident.

Boldt argues that the evidence did not support the verdict because there was no evidence that he could have avoided the violations by shutting down the plant. This contention is simply unsupported by the record. There was testimony from Robert McKiel, president of Astro, that Boldt was authorized to shut down the plant. Whether this court would credit McKiel's testimony is irrelevant; the jury apparently did, and rested its verdict on that ground.

Boldt's assertion of insufficient evidence boils down to a complaint that the jury did not accept his defenses of impossibility and necessity. The trial judge, in his denial of Boldt's motion for a new trial, stated: "The

issues raised herein were presented to the jury. I would have resolved them differently, but I cannot say that the jury's determination was so irrational as to merit a new trial." We agree.

## IMPEACHMENT OF A CHARACTER WITNESS

■ The defense called a character witness, Alan Hoye, who testified as to Boldt's efforts to prevent the illegal storage of drums of hazardous waste at Astro. The defense asked Mr. Hoye his opinion of Boldt's honesty, credibility and law-abiding character. The witness replied, "I've never known Dave to be other than completely honest and above board in anything he's done."

On cross examination, the prosecutor asked Mr. Hoye, "Would it change your opinion if you knew that Mr. Boldt ordered subordinates to meter hazardous waste down the drain into a city sewer?" The defense objected and the prosecutor proffered at side bar: "I can offer, through Tom McNamara, Mr. Boldt's directing him to bring large barrels, some of which contain stickers, hazardous waste stickers, spent chemicals, solvents, and he directs him to put a meter pump on it and put it right in the third-stage reaction tank." The court allowed the question and Mr. Hoye admitted that knowing such additional information about Boldt would change his opinion regarding the defendant's law-abiding character.

Boldt now argues that the government failed to prove its proffer and in fact produced no evidence that Boldt had disposed of solvents as suggested or had improperly disposed of hazardous waste through the pollution control system. He charges that the government's tactic amounted to suggesting that Boldt had committed a serious crime not charged in the indictment, an implication which, coming from the prosecutor, may well have affected the jury.

The government's witness, McNamara, testified that Boldt had ordered him to dispose of items he believed to be formaldehyde, tin lead, and hydrogen peroxide, and that he also believed that "there might

have been some acetones." Boldt testified in response that what McNamara was referring to was not *acetone*, a hazardous waste, but *acetane*, an unrelated chemical which may be properly disposed of through a pollution control system. Likewise the supposed tin lead was actually tin lead stripper, which may be disposed of through a waste treatment system, as may formaldehyde and hydrogen peroxide. Finally, Boldt stated that the materials were not dumped "down the drain," but were put into the third-stage reaction tank, which is the final step of the pre-treatment process.

Like the court below, we do not find much to favor with the government's approach in this line of questioning. The prosecutor seems over-disposed to throw around the highly significant—indeed, without intending any humor, explosive—term "hazardous waste." Nevertheless, we are not inclined to overturn the conviction on this ground. The defendant put his character into evidence. As the Supreme Court held long ago, "[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." *Michelson v. United States*, 335 U.S. 469, 478–79, 69 S.Ct. 213, 219–20, 93 L.Ed. 168 (1948); *see United States v. Sclamo*, 578 F.2d 888, 890 (1st Cir.1978); *Malatkofski v. United States*, 179 F.2d 905, 912 (1st Cir. 1950).

Moreover, the defendant here had ample opportunity—and took advantage of that opportunity—to clarify and explain McNamara's damaging testimony, both by cross-examination of McNamara and during Boldt's own testimony. The points now raised by Boldt were also presented to the jury. We find no error here.

### CLOSING ARGUMENT

■ In its initial closing argument, the government made the following statement: "Ladies and gentlemen, it's a favorite defense tactic to try to get you to focus on unnecessary facts or to get you emotionally wrapped up with the defendant." When defense counsel objected, the court sustained the objection and told the prosecutor: "I think you had better stick to your case." After the prosecutor's argument, defense moved for a mistrial, or in the alternative, a corrective instruction. The court gave this instruction:

Members of the jury, the Assistant U.S. Attorney made a comment to which [defense counsel] Mr. Walker objected and which I sustained the objection, having to do with what may be a favorite defense tactic, tending to suggest that there was some standard and improper tactic that Mr. Walker had employed in his case. That was an improper comment by the Assistant U.S. Attorney and should be totally disregarded by you.

Take the case as you find it. Make the decision on the basis of evidence as you've heard it, and counsel should avoid that kind of characterization of the defendant's efforts. You make the decision.

Boldt now argues that the "favorite defense tactic" remark requires a new trial. He maintains that the curative instruction was insufficient to cure the prejudice.

The remark was clearly improper. Although it is plain that a prosecutor may comment on a defense after it has been raised, this particular comment was made before the defense had established its theory of the case. More critical is the institutional nature of the comment, casting suspicion not merely on a defense possibly employed by this defendant but on the role of defense counsel in general.

■ Despite this impropriety, however, we do not find that a new trial is required. To make this determination we employ the following analysis:

(1) whether the prosecutor's conduct was isolated and/or [less than] deliberate, (2) whether the trial judge's instructions were strong and explicit, and (3) whether it is likely that any prejudice that survived the judge's instructions could have affected the outcome of the case.

*United States v. Giry*, 818 F.2d 120, 133 (1st Cir.) (quoting *United States v. Macci-*

*ni,* 721 F.2d 840, 846 (1st Cir.1983)), *cert. denied,* 484 U.S. 855, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987); *see also United States v. Glantz,* 810 F.2d 316, 320 (1st Cir.), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). On the final step of the inquiry, "[p]erhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant." 3A Wright, Federal Practice and Procedure § 854, at 305 (2d ed. 1982) (quoted in *Giry,* 818 F.2d at 134).

The comment here was plainly deliberate although also fairly isolated. The trial judge gave a very strong and thorough curative instruction, in addition to sustaining defense counsel's immediate objection. The last step is the most difficult to scale. As we have already noted, the evidence in this case, although sufficient to convict, was hardly overwhelming or even particularly strong. Nevertheless, we believe the curative instruction sufficed to dispel any prejudice from the improper comment. *See United States v. Savarese,* 649 F.2d 83, 88 (1st Cir.1981). A new trial is not warranted.

## JURY INSTRUCTION

During its instruction to the jury the court stated:

> The question of whether the only solution would have been to close this plant down is not an issue for you. If nothing can be done with a plant that is polluting in violation of the law other than to close it down, then the law says it must be closed down.
>
> The statute does not have any leeway. It is not a forgiving statute in any respect. It says this must not happen, so it is not enough to say: Well, if we comply with the statute, we will go out of business. Congress has said the pollution of the waterways takes precedence over all other considerations.

Boldt objected to the court's instruction, and now argues that this instruction was wrong as a matter of law, that it undermined the presumption of innocence, the requirement of proof beyond a reasonable doubt, and his two affirmative defenses, and that it sent the message that the court believed the law required a conviction. He argues that "no leeway" and "unforgiving" suggest that there are no affirmative defenses to the charge, whereas in fact both the defense of impossibility and necessity are available.

■■■ We disagree. During closing argument, Boldt's attorney attempted to assert that it was a defense if the jury found that shutting down the plant would unreasonably harm the business or put employees out of work. The Clean Water Act, however, does not appear to recognize a defense of *economic* or *business* necessity. The statute addresses cost concerns in a different context, by distinguishing between "best available technology" and "best practicable technology" in its compliance standards. *See Chemical Mfrs. Ass'n,* 470 U.S. at 118–19, 105 S.Ct. at 1104–05; *see also United States v. City of Hoboken,* 675 F.Supp. 189, 198 (D.N.J.1987) (rejecting "impossibility" as a defense in a civil action under the Clean Water Act). Moreover, federal water pollution laws, including their penal provisions, are construed in a broad, rather than a narrow fashion. *United States v. Hamel,* 551 F.2d 107, 112 (6th Cir.1977) (citing *United States v. Standard Oil,* 384 U.S. 224, 226, 86 S.Ct. 1427, 1428, 16 L.Ed.2d 492 (1966)). Negating Boldt's economic defense was the focus of the disputed instruction. The judge also adequately instructed the jury on Boldt's valid affirmative defenses, so there was no implication that they were not available. The court particularly emphasized that the burden of proof remained with the government at all times, so that once Boldt had raised an affirmative defense, it was up to the government to disprove it. Finally, the court repeatedly stressed the reasonable doubt standard of proof. For these reasons, we find no error in the instruction.

## SENTENCE

■■ The applicable sentencing statute states in part that knowing violators "shall be punished by a fine of not less than $5,000 nor more than $50,000 per day of

violation, or by imprisonment for not more than 3 years, or by both." 33 U.S.C. § 1319(c)(2)(A), (B). At sentencing the court ruled that under the statute it was bound to impose either a fine or a *committed* prison sentence, or, in other words, that it had no power to give a suspended sentence or probation without a fine. Given the choice between imprisonment and a fine, Boldt requested the court not to impose a fine and the court accommodated that request by sentencing Boldt to a one-day committed sentence on each count. Neither party takes issue with the court's calculation under the sentencing guidelines, which applied only to Count 12 as Count 8 was an "old law" count not covered by the Sentencing Reform Act. Under the guidelines the range of imprisonment was zero to six months.

Boldt contends that the court erroneously concluded that where a statute requires a minimum fine *or* imprisonment, there must be a committed jail sentence if no fine is imposed. Boldt argues that there is no such requirement under the old law. Further, under current law, a sentence of probation is explicitly authorized except for Class A and Class B felonies. The violation here is a Class E felony.

Neither party has cited any law whatsoever supporting or refuting Boldt's contention regarding minimum sentence under the old law, and we have been unable to discover any case law on point. Even if a suspended sentence or probation would have been within the discretion of the court, however, so was the sentence actually imposed. Moreover, the court bent over backwards to accommodate Boldt by proceeding directly to the sentencing disposition rather than waiting for a presentence report (which would have been a requisite for probation), when the court clearly would have preferred to wait. Under the circumstances, we choose not to disturb the sentence.

*Affirmed.*