UNITED STATES of America,
Appellee–Cross–Appellant,

v.

PLAZA HEALTH LABORATORIES,
INC., Defendant,

Geronimo Villegas, Defendant–
Appellant–Cross–Appellee.

Nos. 61, 79, Dockets 92–1090, 92–1091.

United States Court of Appeals,
Second Circuit.

Argued Sept. 16, 1992.

Decided Sept. 1, 1993.

Vivian Shevitz, New York City (Jane Simkin Smith, Georgia J. Hinde, of counsel), for defendant-appellant.

Robin L. Greenwald, Asst. U.S. Atty., E.D.N.Y., Brooklyn, NY (Andrew J. Maloney, U.S. Atty., Robert L. Begleiter, Deborah Zwany, Peter R. Ginsberg, of counsel), for appellee.

Before: OAKES, KEARSE, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Defendant Geronimo Villegas appeals from a judgment entered in the United States District Court for the Eastern District of New York, Edward R. Korman, *Judge,* convicting him of two counts of knowingly discharging pollutants into the Hudson River in violation of the Clean Water Act ("CWA"). *See* 33 U.S.C. §§ 1311 and 1319(c)(2). The government cross-appeals, claiming the district court erred in its post-verdict grant of a judgment of acquittal on two counts of violating the knowing-endangerment provisions of the act. *See* 33 U.S.C. § 1319(c)(3).

### FACTS AND BACKGROUND

Villegas was co-owner and vice president of Plaza Health Laboratories, Inc., a blood-testing laboratory in Brooklyn, New York. On at least two occasions between April and

September 1988, Villegas loaded containers of numerous vials of human blood generated from his business into his personal car, and drove to his residence at the Admirals Walk Condominium in Edgewater, New Jersey. Once at his condominium complex, Villegas removed the containers from his car and carried them to the edge of the Hudson River. On one occasion he carried two containers of the vials to the bulkhead that separates his condominium complex from the river, and placed them at low tide within a crevice in the bulkhead that was below the high-water line.

On May 26, 1988, a group of eighth graders on a field trip at the Alice Austin House in Staten Island, New York, discovered numerous glass vials containing human blood along the shore. Some of the vials had washed up on the shore; many were still in the water. Some were cracked, although most remained sealed with stoppers in solid-plastic containers or ziplock bags. Fortunately, no one was injured. That afternoon, New York City workers recovered approximately 70 vials from the area.

On September 25, 1988, a maintenance worker employed by the Admirals Walk Condominium discovered a plastic container holding blood vials wedged between rocks in the bulkhead. New Jersey authorities retrieved numerous blood vials from the bulkhead later that day.

Ten of the retrieved vials contained blood infected with the hepatitis-B virus. All of the vials recovered were eventually traced to Plaza Health Laboratories.

Based upon the May 1988 discovery of vials, Plaza Health Laboratories and Villegas were indicted on May 16, 1989, on two counts each of violating §§ 1319(c)(2) and (3) of the Clean Water Act. 33 U.S.C. §§ 1251 *et seq.* A superseding indictment charged both defendants with two additional CWA counts based upon the vials found in September 1988.

In December of 1990 the district court granted the government's motion to sever all claims against Plaza Health Laboratories, apparently due to Plaza's participation in ongoing bankruptcy proceedings. The government then proceeded to trial against Villegas only.

Counts II and IV of the superseding indictment charged Villegas with knowingly discharging pollutants from a "point source" without a permit. *See* 33 U.S.C. §§ 1311(a), 1319(c)(2). Counts I and III alleged that Villegas had discharged pollutants, knowing that he placed others in "imminent danger of death or serious bodily injury". *See* 33 U.S.C. § 1319(c)(3). On January 31, 1991, following a trial before Judge Korman, the jury found Villegas guilty on all four counts.

Renewing a motion made at trial, Villegas moved for a judgment of acquittal on all counts under rule 29 of the Federal Rules of Criminal Procedure. Judge Korman granted the motion on counts I and III, holding that he had incorrectly instructed the jury on the act's "knowing endangerment" provisions. This ruling is reported at 784 F.Supp. 6, 13–14 (E.D.N.Y.1991). The district judge denied the motion on counts II and IV, rejecting arguments that the act did not envision a human being as a "point source". 784 F.Supp. at 10–11.

Judge Korman sentenced Villegas on counts II and IV to two concurrent terms of twelve months' imprisonment, one year of supervised release, and a $100 special assessment. Execution of the sentence was stayed pending this appeal.

Villegas contends that one element of the CWA crime, knowingly discharging pollutants from a "point source", was not established in his case. He argues that the definition of "point source", 33 U.S.C. § 1362(14), does not include discharges that result from the individual acts of human beings. Raising primarily questions of legislative intent and statutory construction, Villegas argues that at best, the term "point source" is ambiguous as applied to him, and that the rule of lenity should result in reversal of his convictions. The government has cross-appealed from the district court's post-verdict order acquitting Villegas on the two knowing-endangerment counts.

## DISCUSSION

Because "discharge from a point source" is an essential element of a "knowing" violation

as well as a "knowing endangerment" violation, *see* 33 U.S.C. §§ 1319(c)(2)–(3) and discussion *infra,* we need not address the government's contentions regarding the CWA's definition of "imminent danger" if we should conclude that Villegas's discharges were not "from a point source". We therefore consider the "point source" issue first.

## A. *Navigating the Clean Water Act.*

The basic prohibition on discharge of pollutants is in 33 U.S.C. § 1311(a), which states:

Except as in compliance with this section and sections 1312, 1316, 1317, 1328, *1342,* and 1344 of this title, the *discharge* of any *pollutant* by any person shall be unlawful.

*Id.* (emphasis added).

The largest exception to this seemingly absolute rule is found in 33 U.S.C. § 1342, which establishes the CWA's national pollutant discharge elimination system, or NPDES:

(a) Permits for discharge of pollutants

(1) Except as provided in sections 1328 [aquaculture] and 1344 of this title [dredge and fill permits], the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant * * * *notwithstanding section 1311(a) of this title,* upon condition that such discharge will meet * * * all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title * * *.

33 U.S.C. § 1342(a) (emphasis added).

■ Reading § 1311(a), the basic prohibition, and § 1342(a)(1), the permit section, together, we can identify the basic rule, our rhumb line to clean waters, that, absent a permit, "the discharge of any pollutant by any person" is unlawful. 33 U.S.C. § 1311(a).

We must then adjust our rhumb line by reference to two key definitions—"pollutant" and "discharge". "Pollutant" is defined, in part, as "biological materials * * * *discharged* into water." 33 U.S.C. § 1362(6) (emphasis added). "Discharge", in turn, is "any addition of any pollutant to navigable waters *from any point source* * * *.*" (emphasis added). 33 U.S.C. § 1362(12).

As applied to the facts of this case, then, the defendant "added" a "pollutant" (human blood in glass vials) to "navigable waters" (the Hudson River), and he did so without a permit. The issue, therefore, is whether his conduct constituted a "discharge", and that in turn depends on whether the addition of the blood to the Hudson River waters was "from any point source".

For this final course adjustment in our navigation, we look again to the statute.

(14) The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14).

During and after Villegas's trial, Judge Korman labored over how to define "point source" in this case. At one point he observed that the image of a human being is not "conjured up" by congress's definition of "point source". Ultimately, he never defined the "point source" element but he did charge the jury:

Removing pollutants from a container, and a vehicle is a container, parked next to a navigable body of water and physically throwing the pollutant into the water constitutes a discharge from a point source.

In ruling on Villegas's rule 29 motion, however, Judge Korman held that the element "point source" may reasonably be read

to include any discrete and identifiable conduit—*including a human being*—designated to collect or discharge pollutants produced in the course of a waste-generating activity. (emphasis added).

As the parties have presented the issue to us in their briefs and at oral argument, the question is "whether a human being can be a point source". Both sides focus on the district court's conclusion in its rule 29 memorandum that, among other things, the requi-

site "point source" here could be Villegas himself.

Significantly, the jury was never clearly instructed on this legal theory, and the instruction actually given bordered on an improper removal of the determination of an essential element of the crime from the jury's consideration. Serious problems might be presented by the government's attempt to justify Judge Korman's post-verdict definitional efforts as an alternate theory upon which to uphold Villegas's convictions. *Chiarella v. United States,* 445 U.S. 222, 236, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) (court may not affirm criminal conviction on basis of theory not presented to jury).

However, far more fundamental than any error in jury instructions is the problem highlighted by the district court's analytical struggle to find somewhere in the Villegas transaction a "discernible, confined and discrete conveyance". Simply put, that problem is that this statute was never designed to address the random, individual polluter like Villegas.

To determine the scope of the CWA's "point source" definition, we first consider the language and structure of the act itself. If the language is not plain, an excursion into legislative history and context may prove fruitful. Judicial interpretations of the term can be instructive as well, as may be interpretive statements by the agency in charge of implementing the statute. If we conclude after this analysis that the statute is ambiguous as applied to Villegas, then the rule of lenity may apply. *Moskal v. United States,* 498 U.S. 103, 107, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990); *United States v. Concepcion,* 983 F.2d 369, 380 (2d Cir.1992).

1. *Language and Structure of Act.*

■ Human beings are not among the enumerated items that may be a "point source". Although by its terms the definition of "point source" is nonexclusive, the words used to define the term and the examples given ("pipe, ditch, channel, tunnel, conduit, well, discrete fissure", etc.) evoke images of physical structures and instrumentalities that systematically act as a means of conveying pollutants from an industrial source to navigable waterways.

■ In addition, if every discharge involving humans were to be considered a "discharge from a point source", the statute's lengthy definition of "point source" would have been unnecessary. It is elemental that congress does not add unnecessary words to statutes. Had congress intended to punish any human being who polluted navigational waters, it could readily have said: "any person who places pollutants in navigable waters without a permit is guilty of a crime."

The Clean Water Act generally targets industrial and municipal sources of pollutants, as is evident from a perusal of its many sections. Consistent with this focus, the term "point source" is used throughout the statute, but invariably in sentences referencing industrial or municipal discharges. *See, e.g.,* 33 U.S.C. § 1311 (referring to "owner or operator" of point source); § 1311(e) (requiring that effluent limitations established under the Act "be applied to all point sources of discharge"); § 1311(g)(2) (allows an "owner or operator of a point source" to apply to EPA for modification of its limitations requirements); § 1342(f) (referring to classes, categories, types, and sizes of point sources); § 1314(b)(4)(B) (denoting "best conventional pollutant control technology measures and practices" applicable to any point source within particular category or class); § 1316 ("any point source * * * which is constructed as to meet all applicable standards of performance"); § 1318(a) (administrator shall require owner or operator of any point source to install, use and maintain monitoring equipment or methods); and § 1318(c) (states may develop procedures for inspection, monitoring, and entry with respect to point sources located in state).

This emphasis was sensible, as "[i]ndustrial and municipal point sources were the worst and most obvious offenders of surface water quality. They were also the easiest to address because their loadings emerge from a discrete point such as the end of a pipe." David Letson, *Point/Nonpoint Source Pollution Reduction Trading: An Interpretive Survey,* 32 Nat.Resources J. 219, 221 (1992).

Finally on this point, we assume that congress did not intend the awkward meaning that would result if we were to read "human being" into the definition of "point source". Section 1362(12)(A) defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source". Enhanced by this definition, § 1311(a) reads in effect "the addition of any pollutant to navigable waters *from any point source by any person* shall be unlawful" (emphasis added). But were a human being to be included within the definition of "point source", the prohibition would then read: "the addition of any pollutant to navigable waters *from any person by any person* shall be unlawful", and this simply makes no sense. As the statute stands today, the term "point source" is comprehensible only if it is held to the context of industrial and municipal discharges.

### 2. *Legislative History and Context.*

The broad remedial purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters". 33 U.S.C. § 1251(a). The narrow questions posed by this case, however, may not be resolved merely by simple reference to this admirable goal. *See National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 178 (D.C.Cir.1982) ("it is one thing for Congress to announce a grand goal, and quite another for it to mandate full implementation of that goal"). We agree with the court in *National Wildlife Fed'n* that "even if we accept the purposes section at face value, it is only suggestive, not dispositive of [the issue before us]. Caution is always advisable in relying on a general declaration of purpose to alter the apparent meaning of a specific provision." *Id.*

The legislative history of the CWA, while providing little insight into the meaning of "point source", confirms the act's focus on industrial polluters. Congress required NPDES permits of those who discharge from a "point source". The term "point source", introduced to the act in 1972, was intended to function as a means of identifying industrial polluters—generally a difficult task because pollutants quickly disperse throughout the subject waters. The senate report for the 1972 amendments explains:

> In order to further clarify the scope of the regulatory procedures in the Act the Committee had added a definition of point source to distinguish between control requirements where there are *specific confined conveyances, such as pipes,* and control requirements which are imposed to control runoff. The control of pollutants from runoff is applied pursuant to section 209 and the authority resides in the State or other local agency.

S.Rep. No. 92–414, *reprinted in* 1972 U.S.C.C.A.N. 3668, 3744.

Senator Robert Dole added his comments to the committee report:

> Most of the problems of agricultural pollution deal with non-point sources. Very simply, a non-point source of pollution is one that does not confine its polluting discharge to one fairly specific outlet, such as a sewer pipe, a drainage ditch or a conduit; thus, a feedlot would be considered to be a non-point source as would pesticides and fertilizers.

*Id.* at 3760 (supplemental views). *See also National Wildlife Fed'n*, 693 F.2d at 175 (congress's focus was on traditional industrial and municipal wastes); *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 118–21, 97 S.Ct. 965, 970–71, 51 L.Ed.2d 204 (1977) (outlines EPA scheme of effluent limitations for subject industrial groups).

We find no suggestion either in the act itself or in the history of its passage that congress intended the CWA to impose criminal liability on an individual for the myriad, random acts of human waste disposal, for example, a passerby who flings a candy wrapper into the Hudson River, or a urinating swimmer. Discussions during the passage of the 1972 amendments indicate that congress had bigger fish to fry.

The 1972 congress modeled the NPDES, its aggressive new permitting program, after the Rivers and Harbors Act of 1899 ("RHA"; known also as the Refuse Act), 33 U.S.C. § 401, *et seq. See* S.Rep. No. 92–414, *reprinted in* 1972 U.S.C.C.A.N. 3668, 3672 & 3738. The CWA's focus on transporting pol-

lutants to navigable waters via the "point source" mechanism represented a departure from the RHA's more general approach:

> It shall not be lawful to throw, discharge, or deposit * * * any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States * * *.

33 U.S.C. § 407.

Unlike §§ 1311 and 1319(c)(2) of the CWA, the RHA's relevant criminal provision, 33 U.S.C. § 411, has been held to provide for strict liability, and the most severe criminal penalty is a misdemeanor. *United States v. White Fuel Corp.,* 498 F.2d 619, 622 (1st Cir.1974). Accordingly, we view with skepticism the government's contention that we should broadly construe the greatly magnified penal provisions of the CWA based upon RHA cases that did so in the context of strict-liability and misdemeanor penalties. *See, e.g., United States v. Standard Oil Co.,* 384 U.S. 224, 229–30, 86 S.Ct. 1427, 1429–30, 16 L.Ed.2d 492 (1966) (holding "refuse matter" in § 407 includes commercially valuable gasoline accidentally discharged into navigable river); *United States v. American Cyanamid Co.,* 354 F.Supp. 1202, 1205 (S.D.N.Y. 1973) (construing RHA broadly, court held that refuse discharged into tributary satisfied "navigable waters" requirement); *see also United States v. Republic Steel Corp.,* 362 U.S. 482, 489–91, 80 S.Ct. 884, 888–90, 4 L.Ed.2d 903 (1960) (RHA construed broadly in injunction context; RHA "obstruction" included liquid matter discharged from mills which impaired navigation by settling in bottom of channel).

### 3. *Caselaw.*

Our search for the meaning of "point source" brings us next to judicial constructions of the term.

The "point source" element was clearly established in the few CWA criminal decisions under § 1319(c) that are reported. *See United States v. Boldt,* 929 F.2d 35, 37–38 (1st Cir.1991) (discharge of partially untreated industrial wastewater from storage tank directly into municipal sewer); *United States v. Frezzo Bros., Inc.,* 602 F.2d 1123, 1125 (3d Cir.1979) (compost materials discharged from pipe into tributary of creek), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *United States v. Hamel,* 551 F.2d 107, 108 (6th Cir.1977) (gasoline pumped into lake from underground tank); *cf. United States v. Oxford Royal Mushroom Products, Inc.,* 487 F.Supp. 852, 854 (E.D.Pa.1980) (overflow of spray-irrigation system discharging waste water into nearby stream is "point source" discharge).

With the exception of *Oxford Royal Mushroom, supra,* the cases that have interpreted "point source" have done so in civil-penalty or licensing settings, where greater flexibility of interpretation to further remedial legislative purposes is permitted, and the rule of lenity does not protect a defendant against statutory ambiguities. *See, e.g., Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 922 (5th Cir.1983) ("point source" includes bulldozing equipment that discharged dredged materials onto wetland).

For example, our circuit recently held in *Dague v. City of Burlington,* a civil-penalty case, that a discharge of pollutant-laden leachate into a culvert leading to navigable waters was through a "point source". 935 F.2d 1343, 1354–55 (2d Cir.1991), *rev'd in part on other grounds,* — U.S. —, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). But in *Dague,* unlike in this case, the city's discharge involved a culvert, one of the specifically enumerated examples of a "point source" set forth in § 1362(14). *Dague,* 935 F.2d at 1354. *Dague* thus presented a classic "point source" discharge.

The government relies on broad dicta in another civil case, *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir. 1979), in which the court held "[t]he concept of a point source was designed to further this [permit regulatory] scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States." We do not find this *Earth Sciences* dicta persuasive here, however, because that court found a "point source" in a ditch used in the mining operation—certainly not a far leap when

"ditch" also is an expressly listed example of a "point source". We cannot, however, make the further leap of writing "human being" into the statutory language without doing violence to the language and structure of the CWA.

### 4. *Regulatory Structure.*

Finally, not even the EPA's regulations support the government's broad assertion that a human being may be a "point source". *Cf. National Wildlife Fed'n,* 693 F.2d at 166–67 & 173 n. 54 (as EPA has power to define point and nonpoint sources in CWA, courts must give great deference to EPA's construction of "point source"). The EPA stresses that the discharge be "through pipes, sewers, or other conveyances":

> *Discharge of a pollutant* means:
>
> (a) Any addition of any "pollutant" or combination of pollutants to "waters of the United States" from any "point source".
>
> \*   \*   \*   \*   \*   \*
>
> This definition includes additions of pollutants into waters of the United States from: surface runoff which is collected or channelled by man; *discharges through pipes, sewers, or other conveyances* owned by a State, municipality, or other person which do not lead to a treatment works; and discharges through pipes, sewers, or other conveyances, leading into privately owned treatment works. This term does not include an addition of pollutants by any "indirect discharger."

40 C.F.R. § 122.2 (1992) (emphasis supplied).

In sum, although congress had the ability to so provide, § 1362(14) of the CWA does not expressly recognize a human being as a "point source"; nor does the act make structural sense when one incorporates a human being into that definition. The legislative history of the act adds no light to the muddy depths of this issue, and cases urging a broad interpretation of the definition in the civil-penalty context do not persuade us to do so here, where congress has imposed heavy criminal sanctions. Adopting the government's suggested flexibility for the definition would effectively read the "point source" element of the crime out of the statute, and not even the EPA has extended the term "point source" as far as is urged here.

We accordingly conclude that the term "point source" as applied to a human being is at best ambiguous.

### B. *Rule of Lenity.*

■ In criminal prosecutions the rule of lenity requires that ambiguities in the statute be resolved in the defendant's favor. *Crandon v. United States,* 494 U.S. 152, 168, 110 S.Ct. 997, 1006, 108 L.Ed.2d 132 (1990) (ambiguity in criminal statute resolved in defendant's favor "unless and until Congress plainly states that we have misconstrued its intent"); *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) (same); *Huddleston v. United States,* 415 U.S. 814, 830–31, 94 S.Ct. 1262, 1271–72, 39 L.Ed.2d 782 (1974) (ambiguity concerning ambit of criminal statutes should be resolved in favor of lenity). In other words, we cannot add to the statute what congress did not provide. "[B]efore a man can be punished as a criminal under the Federal law his case must be 'plainly and unmistakably' within the provisions of some statute." *United States v. Gradwell,* 243 U.S. 476, 485, 37 S.Ct. 407, 411, 61 L.Ed. 857 (1917).

Since the government's reading of the statute in this case founders on our inability to discern the "obvious intention of the legislature", *Huddleston,* 415 U.S. at 831, 94 S.Ct. at 1272, to include a human being as a "point source", we conclude that the criminal provisions of the CWA did not clearly proscribe Villegas's conduct and did not accord him fair warning of the sanctions the law placed on that conduct. Under the rule of lenity, therefore, the prosecutions against him must be dismissed.

### C. *Knowing Endangerment.*

As noted above, our ruling on "point source" obviates the need for us to address the government's cross-appeal that the district court erred in acquitting Villegas of two counts of "knowing endangerment" when it adopted post-trial a different definition of

"imminent danger" than what it had included in its charge to the jury. We affirm the district court's acquittal on these two counts on the same ground upon which we reverse the other two counts: defendant's discharges were not from a "point source" as defined in the act.

## CONCLUSION

The Clean Water Act targets industrial and municipal production of pollutants. Its criminal provisions do not reach actions such as those done by Villegas, despite their heinous character. While we might think it desirable to punish such an obviously wrong act, we must nevertheless ensure that we apply the statute as congress wrote it, giving Villegas the benefit of the substantial ambiguity in its meaning. Justice Douglas's comments, made in reviewing a 1966 prosecution under the Rivers and Harbors Act, are equally appropriate today:

> This case comes to us at a time in the Nation's history when there is greater concern than ever over pollution—one of the main threats to our free-flowing rivers and to our lakes as well. The crisis that we face in this respect would not, of course, warrant us in manufacturing offenses where Congress has not acted nor in stretching statutory language in a criminal field to meet strange conditions.

*Standard Oil Co.*, 384 U.S. at 225, 86 S.Ct. at 1428.

Compelled by the rule of lenity, we reverse Villegas's judgment of conviction and remand with a direction to dismiss the indictment.

Convictions reversed; cross-appeal affirmed.

OAKES, Circuit Judge, dissenting:

I agree that this is not the typical Clean Water Act prosecution—though, as criminal prosecutions under the Act are infrequent, or at least result in few published judicial opinions, what is "typical" is as yet ill-defined. I also agree that the prosecutors in this case may not have defined the theory of their case

before proceeding to trial as well as they might have, thereby complicating the task of determining whether the jury was asked to resolve the proper factual questions. However, because I do not agree that a person can never be a point source, and because I believe that Mr. Villegas' actions, as the jury found them, fell well within the bounds of activity proscribed by the Clean Water Act's bar on discharge of pollutants into navigable waters, I am required to dissent.

*Point source.*

I begin with the proposition that the Clean Water Act bars "the discharge of any pollutant by any person," except as authorized elsewhere in the Act. 33 U.S.C. § 1311(a) (1988). The only limiting factors are definitional: the Act bars "discharges" from "point sources" of "pollutants" to "navigable waters." [1] It does not bar nonpoint source pollution, pollution of dry land or nonnavigable waters, or the movement of existing pollution within the navigable waters.

The key in this case is the definition of a point source. The term is introduced as part of the definition of "discharge of a pollutant": "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A) (1988). The term "point source," in turn, is defined as

> *any discernible, confined and discrete conveyance, including but not limited to* any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14) (1988) (emphasis added).

The language of this definition indicates that it encompasses a wide range of means of placing pollutants into navigable waters. The question before us is what, in addition to the listed examples, is a "discernible, confined and discrete conveyance."

---

1. This list is not exclusive. The terms listed are defined at 33 U.S.C. § 1362(12), (14), (6) and (7) (1988), respectively.

I begin with the obvious, in hopes that it will illuminate the less obvious: the classic point source is something like a pipe. This is, at least in part, because pipes and similar conduits are needed to carry large quantities of waste water, which represents a large proportion of the point source pollution problem. Thus, devices designed to convey large quantities of waste water from a factory or municipal sewage treatment facility are readily classified as point sources. Because not all pollutants are liquids, however, the statute and the cases make clear that means of conveying solid wastes to be dumped in navigable waters are also point sources. *See, e.g.,* 33 U.S.C. § 1362(14) ("rolling stock," or railroad cars, listed as an example of a point source); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 922 (5th Cir.1983) (backhoes and bulldozers used to gather fill and deposit it on wetlands are point sources).

What I take from this look at classic point sources is that, at the least, an organized means of channeling and conveying industrial waste in quantity to navigable waters is a "discernible, confined and discrete conveyance." The case law is in accord: courts have deemed a broad range of means of depositing pollutants in the country's navigable waters to be point sources. *See, e.g., Rybachek v. EPA,* 904 F.2d 1276 (9th Cir. 1990) (placer mining; sluice box from which discharge water is redeposited in stream is point source, despite provisions protecting some mining activities); *United States v. M.C.C. of Fla., Inc.,* 772 F.2d 1501, 1505–06 (11th Cir.1985) (tugs redepositing dirt from bottom of water body onto beds of water grass are point sources discharging the dirt), *vacated on other grounds,* 481 U.S. 1034, 107 S.Ct. 1968, 95 L.Ed.2d 809 (1987) (defendants' right to jury trial); *Sierra Club v. Abston Constr. Co.,* 620 F.2d 41, 45 (5th Cir.1980) (spill of contaminated runoff from strip mine, if collected or channeled by the operator, is point source discharge); *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th Cir.1979) (same); *Appalachian Power Co. v. Train,* 545 F.2d 1351, 1372 (4th Cir.1976) (same); *O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 642, 655 (E.D.Pa.1981) (same). Nor have courts been inclined to exclude mining or agricultural point sources, despite the fact that portions of the Clean Water Act protect these industries to some extent. *See Rybachek,* 904 F.2d 1276; *Consolidation Coal Co. v. Costle,* 604 F.2d 239, 251 (4th Cir.1979) (EPA has no discretion to exempt mining point sources from regulation), *rev'd in part on other grounds sub nom. National Crushed Stone Ass'n,* 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980); *United States v. Frezzo Bros., Inc.,* 546 F.Supp. 713, 718 (E.D.Pa.1982) (mushroom composting is not agriculture, so exception for agricultural point sources not applicable to pipe carrying stormwater runoff), *aff'd,* 703 F.2d 62 (3d Cir.) (per curiam), *cert. denied,* 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983).

Further, the legislative history indicates that the Act was meant to control periodic, as well as continuous, discharges. S.Rep. No. 92–414, 92d Cong. 1st Sess. (1971), reprinted at 1972 U.S.C.C.A.N. 3668, 3705.

In short, the term "point source" has been broadly construed to apply to a wide range of polluting techniques, so long as the pollutants involved are not just humanmade, but reach the navigable waters by human effort or by leaking from a clear point at which waste water was collected by human effort. From these cases, the writers of one respected treatise have concluded that such a "man-induced gathering mechanism plainly is the essential characteristic of a point source" and that a point source, "[p]ut simply, ... is an identifiable conveyance of pollutants." 5 Robert E. Beck, *Waters & Water Rights* § 53.01(b)(3) at 216–17 (1991), *citing Sierra Club v. Abston Constr. Co.,* 620 F.2d at 45 (miners channeled waters into sump pits which leaked after heavy rains); *Earth Sciences,* 599 F.2d at 373; *and Avoyelles Sportsmen's League,* 473 F.Supp. 525. *See also Dague v. City of Burlington,* 935 F.2d 1343, 1354–55 (2d Cir.1991) (term "point source" should be defined broadly to include culvert conveying landfill leachate, though the culvert itself did not "add" pollutants to the navigable waters, but conveyed them from one navigable body of water, into which the pollutants had leaked, to another), *rev'd in part on other grounds,* —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *Kenne-*

cott Copper Corp. v. EPA, 612 F.2d 1232, 1243 (10th Cir.1979) (noting that Congress defined "point source" broadly so that it would be applicable to thousands of contemplated point sources, not all of which could possibly be enumerated); Appalachian Power Co. v. Train, 545 F.2d 1351, 1373 (EPA may regulate channeled runoff, but not unchanneled runoff). In explaining why a broad definition was needed, the Kennecott Copper court, quoting American Petroleum Inst. v. EPA, 540 F.2d 1023, 1032 (10th Cir. 1976), cert. denied, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977), noted that the statute sets as its goal the "attainment of the no discharge objective," and that this objective could not be achieved if the term "point source" were read narrowly. 612 F.2d at 1243.

This broad reading of the term "point source" is essential to fulfill the mandate of the Clean Water Act, in that

> [t]he touchstone of the regulatory scheme is that those needing to use the waters for waste distribution must seek and obtain a permit to discharge that waste, with the quantity and quality of the discharge regulated. The concept of a point source was designed to further this scheme by embracing the broadest possible definition of any identifiable conveyance from which

pollutants might enter the waters of the United States.

· · · ·

We believe it contravenes the intent of FWPCA and the structure of the statute to exempt from regulation any activity that emits pollution from an identifiable point. Earth Sciences, 599 F.2d 368, 373.

Nonetheless, the term "point source" sets significant definitional limits on the reach of the Clean Water Act. Fifty percent or more of all water pollution is thought to come from nonpoint sources. S.Rep. 99–50, 99th Cong., 1st Sess. 8 (1985); William F. Pedersen, Jr., Turning the Tide on Water Quality, 15 Ecol. L.Q. 69, n. 10 (1988). So, to further refine the definition of "point source," I consider what it is that the Act does not cover: nonpoint source discharges.[2]

Nonpoint source pollution is, generally, runoff: salt from roads, agricultural chemicals from farmlands, oil from parking lots, and other substances washed by rain, in diffuse patterns, over the land and into navigable waters.[3] The sources are many, difficult to identify and difficult to control. Indeed, an effort to greatly reduce nonpoint source pollution could require radical changes in land use patterns which Congress evidently was unwilling to mandate without further

---

**2.** The cases and commentators all seem to assume that all water pollution is either point source pollution or nonpoint source pollution. See, e.g., Oregon Natural Resources Council v. United States Forest Service, 834 F.2d 842, 849 (9th Cir.1987); Friends of the Sakonnet v. Dutra, 738 F.Supp. 623, 630 and n. 11 (D.R.I.1990); Zygmunt J.B. Plater, et al., Environmental Law and Policy: Nature, Law and Society 830 (1992); Frederick R. Anderson, Daniel R. Mandelker, and A. Dan Tarlock, Environmental Protection: Law and Policy 377 (2d ed. 1990); 2 William H. Rodgers, Jr., Environmental Law: Air and Water § 4.9 at 125–26 and § 4.10 at 146 (but noting that distinguishing point sources from nonpoint sources can be difficult, and listing as an example of a difficult question "the fellow in the truck at the edge of the stream," id. at 126) (1986); Frank P. Grad, Treatise on Environmental Law 3.03[4][n] 3–215 n. 366.6 (7/92) (looseleaf); Esther Bartfeld, Point–Nonpoint Source Trading: Looking Beyond Potential Cost Savings, 23 Envtl. Law 43, 45, 45 n. 6, 47 (1993); John H. Davidson, Commentary: Using Special Water Districts to Control Nonpoint Source of Water Pollution, 22 Land Use & Envtl.L.Rev. 515, 516 (1991); Rob-

ert D. Fentress, Comment: Nonpoint Source Pollution, Groundwater, and the 1987 Water Quality Act: Section 208 Revisited?, 19 Envtl.L. 807, 811 n. 16 (1989); Richard J. Lazarus, Comment: Nonpoint Source Pollution, 2 Harv.Envtl.L.Rev. 176, 176–77, 177 n. 2 (1977).

**3.** According to the EPA, nonpoint source pollution

> is caused by diffuse sources that are not regulated as point sources and normally is associated with agricultural, silvicultural and urban runoff, runoff from construction activities, etc. Such pollution results in the human-made or human-induced alteration of the chemical, physical, biological, and radiological integrity of water. In practical terms, nonpoint source pollution does not result from a discharge at a specific, single location (such as a single pipe) but generally results from land runoff, precipitation, atmospheric deposition, or percolation. EPA Office Of Water, Office of Water Regulations and Standards, Nonpoint Source Guidance 3 (1987).

study.[4] The structure of the statute—which regulates point source pollution closely, while leaving nonpoint source regulation to the states under the Section 208 program—indicates that the term "point source" was included in the definition of discharge so as to ensure that nonpoint source pollution would *not* be covered. Instead, Congress chose to regulate first that which could easily be regulated: direct discharges by identifiable parties, or point sources.

This rationale for regulating point and nonpoint sources differently—that point sources may readily be controlled and are easily attributable to a particular source, while nonpoint sources are more difficult to control without radical change, and less easily attributable, once they reach water, to any particular responsible party—helps define what fits within each category. Thus, Professor Rodgers has suggested, "[t]he statutory 'discernible, confined and discrete conveyance' ... can be understood as singling out those candidates suitable for control-at-the-source." 2 William H. Rodgers, Jr., *Environmental Law: Air and Water* § 4.10 at 150 (1986). And, as Professor Rodgers notes, "[c]ase law confirms the controllability theory, adding to it a responsibility component, so that 'point sources' are understood both as sources that can be cleaned up and as sources where fairness suggests the named parties should do the cleaning." *Id.* And see, *e.g.*, *National Resources Defense Council, Inc. v. EPA*, 915 F.2d 1314, 1316 (9th Cir.1990) ("The Act focused on point source polluters presumably because they could be identified and regulated more easily than nonpoint source polluters."); *Earth Sciences*, 599 F.2d at 371 ("[b]ecause nonpoint sources of pollution ... are virtually impossible to isolate to one polluter, no permit or regulatory system was established as to them"); National Water Commission, *Water Policies for the Future: Final Report to the President and to the Congress of the United States* 64 (1973).

While Villegas' activities were not prototypical point source discharges—in part because he was disposing of waste that could have been disposed of on land, and so did not need a permit or a pipe—they much more closely resembled a point source discharge than a nonpoint source discharge. First, Villegas and his lab were perfectly capable of avoiding discharging their waste into water: they were, in Professor Rodgers' terms, a "controllable" source.

Furthermore, the discharge was directly into water, and came from an identifiable point, Villegas. Villegas did not dispose of the materials on land, where they could be washed into water as nonpoint source pollution. Rather, he carried them, from his firm's laboratory, in his car, to his apartment complex, where he placed them in a bulkhead below the high tide line. I do not think it is necessary to determine whether it was Mr. Villegas himself who was the point source, or whether it was his car, the vials, or the bulkhead: in a sense, the entire stream of Mr. Villegas' activity functioned as a "discrete conveyance" or point source. The point is that the source of the pollution was clear, and would have been easy to control. Indeed, Villegas was well aware that there were methods of controlling the discharge (and that the materials were too dangerous for casual disposal): his laboratory had hired a professional medical waste handler. He simply chose not to use an appropriate waste disposal mechanism.

Villegas' method may have been an unusual one for a corporate officer, but it would undermine the statute—which, after all, sets as its goal the elimination of discharges, 33 U.S.C. § 1311(a)—to regard as "ambiguous" a Congressional failure to list an unusual

---

4. As Professors Anderson, Mandelker, and Tarlock have observed,

> Congress expressed great faith in the ability of engineers to limit what came out of pipes but less faith in the ability of engineers to fix nonpoint source pollution:
>
> There is no effective way as yet, other than land use control, by which you can intercept that runoff and control it in the way that you do a point source. We have not yet developed technology to deal with that kind of a problem. ... [Senate Debate on S. 2770, Nov. 2, 1971, reported in 1972 Legislative History, at 1315.] Frederick R. Anderson, Daniel R. Mandelker, and A. Dan Tarlock, *Environmental Protection: Law and Policy* 377 (2d ed. 1990).

method of disposing of waste.[5] I doubt that Congress would have regarded an army of men and women throwing industrial waste from trucks into a stream as exempt from the statute. Since the Act contains no exemption for de minimus violations—since, indeed, many Clean Water Act prosecutions are for a series of small discharges, each of which is treated as a single violation—I cannot see that one man throwing one day's worth of medical waste into the ocean differs (and indeed, with this type of pollution, it might be that only a few days' violations could be proven even if the laboratory regularly relied on Villegas to dispose of its waste by throwing it into the ocean). A different reading would encourage corporations perfectly capable of abiding by the Clean Water Act's requirements to ask their employees to stand between the company trucks and the sea, thereby transforming point source pollution (dumping from trucks) into nonpoint source pollution (dumping by hand). Such a method is controllable, easily identifiable, and inexcusable. To call it nonpoint source pollution is to read a technical exception into a statute which attempts to define in broad terms an activity which may be conducted in many different ways.

Having explained my own view of what a "point source" is, and why Villegas, or his activities in carrying waste from his lab to the ocean, was a point source, I will attempt to confront the majority's counterarguments. My colleagues suggest that a person can never be a point source, relying heavily on the supposed redundancy produced when the Act's language barring the "discharge of any

pollutant by any person" is read with the definitional terms placed in terms of the linguistic variables, as follows: "any addition of any pollutant to navigable waters from a person by a person." Granted, this sounds odd. But I believe the oddity is an artifact of assuming that the term "person" means the same thing in both parts of the sentence, and that in both cases it means what it means in everyday language.

The apparent oddness disappears when one grasps that the first term "person" in the peculiar sentence means "a person acting as a point source" [6] and that the second term "person" has been defined, typically for statutes imposing responsibility on a variety of parties, but not typically for ordinary speech, as a responsible party. As the linguistic hint "any" before both "person" and "point source" suggests, the terms are to be construed broadly. Thus, for example, one could fill in the linguistic variables as follows: the Act bars the addition of any pollutant to navigable waters by an employee's throwing them there (a person acting as a point source) at the instruction of his or her employer (a corporation, or person capable of being held responsible) and in particular of his or her supervisor (also a person capable of being held responsible). More specifically, the sentence could refer to an individual hired to convey, by hand, all of a corporation's toxic wastes from the company's back door to the Mississippi River, three feet away (the point source), by that individual and by the corporation which authorized the disposal (the potential defendants). I do not think technical arguments about whether the

---

**5.** I recognize the dangers of "pa[ying] too much attention to the broad stated purposes of the [Clean Water] Act." *National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 171 (D.C.Cir.1982) (reversing district court ruling that EPA decision not to regulate dams as point sources was improper in light of these broad goals, and holding that the EPA could reasonably conclude that dams were not covered, at least where they do not "add" ordinary "pollutants," but either move already polluted water from one side of the dam to the other or change water "conditions" such as heat, dissolved oxygen content, and saturation levels).

However, there are also dangers to paying too little attention to such broad stated goals. While the Clean Water Act may not always live up to its

grand ambitions, in particular by setting definitional limits on what it covers (only pollution, only point sources), its ambitious goals are nonetheless useful interpretive guides: they indicate that, all other things being equal, a generous rather than a cramped interpretation of the statute is more likely to be what Congress intended.

**6.** In my view, persons can be both point and nonpoint sources of pollution. They may be point sources when they deposit waste directly into water; they may be nonpoint sources when they, for example, spread fertilizer on the ground or deposit oil in a driveway, leaving it to be washed into nearby rivers. Thus, to say that the Clean Water Act bars persons polluting, rather than point sources polluting, would be too broad.

toxic substances were in discrete containers are fruitful when the activity is discrete, conveys pollutants, and is confined to a clear, traceable single source. When a company chooses to use the nation's waters as a dumpsite for waste it has created and gathered in a manageable place,[7] it should ask for a permit or face prosecution.

I am of course given pause, however, by the nature of the criminal sanctions attached to point source discharges under § 1319. Given the broad statutory definitions of pollutant and point source, it would appear that a knowing violation would include intentionally throwing a candy wrapper into the ocean—and that this is an activity which could subject the thrower to a $25,000 fine and three years in jail. It seems improbable to me that this could have been Congress' intent. Consequently, I would with the majority read the statute as ambiguous as it pertains to individual litterers, as opposed to disposers of industrial and municipal waste.[8] The latter were the principal targets of the authors of the CWA, and, as professional creators of waste, charged with knowledge that disposal of waste into navigable waters is a crime. *Cf. United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (Federal Food, Drug and Cosmetic Act requires corporate officers standing in a responsible relationship to the public interest to ensure that products are safe, subject to criminal liability).

Furthermore, no factual dispute essential to finding Villegas' activities to have been a point source discharge remains. The jury concluded that Villegas did in fact place pollutants—the materials he brought from the laboratory—into navigable waters; the only question for us is whether this activity is point source pollution. *Cf. United States v. Law,* 979 F.2d 977, 979 (4th Cir.1992) (misdefinition of point source in criminal case harmless, where action, if it occurred at all, was point source discharge), *cert. denied,* —— U.S. ——, 113 S.Ct. 1844, 123 L.Ed.2d 468 (1993). Thus, I do not believe that the difficulty the prosecutors had here in defining Villegas' offense resulted in their failing to prove that Villegas violated the law.

*Rule of Lenity.*

My colleagues also suggest that the statute is sufficiently ambiguous that the rule of lenity requires resolving the ambiguity in Villegas' favor. However, as I have indicated, I do not think the Clean Water Act is ambiguous with respect to an individual physically disposing of medical wastes, in quantity, directly into navigable waters, by means of a controllable, discrete conveyance and course of action. As the Supreme Court has noted,

> [b]ecause the meaning of language is inherently contextual, we have declined to deem a statute 'ambiguous' for purposes of lenity merely because it was possible to articulate a construction more narrow than that urged by the Government. Nor have we deemed a division of judicial authority automatically sufficient to trigger lenity. If that were sufficient, one court's unduly narrow reading of a criminal statute would become binding on all other courts....

7. I mean to distinguish a company whose agricultural or other activity leaves pollutants dispersed on the land, which may then find their way into the nation's waters.

8. An alternative—that the Act applies only to major discharges—seems to me both administratively unworkable (where does one draw the line?) and inconsistent with the statute and case law. The statutory definition of "discharge" refers to "any" addition of "any" pollutant from "any" point source, indicating a congressional intent to bar all, even minor, violations. Further, the D.C.Circuit has held that EPA has no discretion to limit regulation of point sources to those it deems most significant. *National Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369, 1374 (D.C.Cir.1977). This, too, indicates that small as well as large point sources are governed by the Act. Finally, I would note that within the statute's definitional limits, it takes on an absolutist tone. The statute's stated goals, "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a) (1988), suggest that eliminating, not reducing, pollution is the aim. Thus, while the Act exempts certain types of pollution—nonpoint source and agricultural return flows—for policy reasons seen as trumping, at least temporarily, the goal of zero pollution, it takes a categorical approach to point source pollution. As the *Costle* case suggests, neither agencies nor courts should rewrite the statute to be more "reasonable"—less protective of our nation's waters and more indulgent of polluters—than Congress intended.

Instead we have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to "the language and structure, legislative history, and motivating policies" of the statute.

*Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990), *quoting Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) (citations omitted). *See also United States v. Concepcion,* 983 F.2d 369, 379 (1993) (rule of lenity applies only if statute is ambiguous, "giving [the words of the statute] their fair meaning in accordance with the intentions manifested by Congress,") (citing *Bifulco,* 447 U.S. at 387, 100 S.Ct. at 2252) rather than " 'at the beginning as an overriding consideration of being lenient to wrongdoers' " (quoting *United States v. Turkette,* 452 U.S. 576, 587 n. 10, 101 S.Ct. 2524, 2531 n. 10, 69 L.Ed.2d 246 in turn quoting *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961)).

Having resorted to the language and structure, legislative history and motivating policies of the Clean Water Act, I think it plain enough that Congress intended the statute to bar corporate officers from disposing of corporate waste into navigable waters by hand as well as by pipe. Further, I would note that this is not the sort of activity that Villegas could honestly have believed violated no statute, whether promulgated by federal, state, or local authorities. Thus, this is not a case in which the defendant had no fair warning that his actions were illegal. No compliance attorney here could have struggled with the difficulty of deciding whether this was activity for which a permit should be sought, as might be the case in a factory dealing with runoff that arguably was channeled and thereby transformed from non-point to point source pollution; rather, an attorney asked to advise Villegas whether his activity was permissible might say that there was as yet no case law indicating that such activity was point source pollution under the Clean Water Act, but that such a view was certainly consistent with the Act and that the behavior would almost certainly be proscribed by that Act or some other.

*Knowing Endangerment.*

I concur in the majority's ruling on the knowing endangerment counts, though for a different reason. I think the trial court was correct in concluding that the government failed, as a matter of law, to establish "imminent danger," since its own experts agreed that the risk that someone would be harmed by the hepatitis-infected blood in some of the vials, while serious, was quite low.

### CONCLUSION

Accordingly, I would affirm the rulings of the district court.